

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

### (Missoula Division)

UNITED STATES OF AMERICA
*ex rel.*
[UNDER SEAL]

Relator

Civil Action No. CV 16·125·M·DLC

**TO BE FILED IN CAMERA AND
UNDER SEAL**

vs.

DO NOT PUT IN PRESS BOX

DO NOT ENTER ON PACER

[UNDER SEAL]

Defendants.

## DOCUMENT TO BE KEPT UNDER SEAL

Paul Odegaard, Esq.
Odegaard Braukmann Law, PLLC
1601 Lewis Avenue, Suite 101
Billings, Montana
59102
(406) 640-4441
paul@oblawmt.com

**Lead Counsel**
Bryan A. Vroon, Esq.
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com

Edward D. Robertson, Jr.
Bartimus, Frickleton & Robertston
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454
chiprob@earthlink.net

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

(Missoula Division)

UNITED STATES OF AMERICA
*ex rel.*
JON MOHATT
                        CASE NO.

Relator

                                                **TO BE FILED IN**
                                                **CAMERA AND**
                                                **UNDER SEAL**

vs.                                     **DO NOT PUT IN PRESS BOX**

                                         **DO NOT ENTER ON PACER**

KALISPELL REGIONAL HEALTHCARE;
KALISPELL REGIONAL MEDICAL CENTER;
AND JOHN DOES 1-100

Defendants.

## RELATOR'S COMPLAINT UNDER
## THE FEDERAL FALSE CLAIMS ACT

**Introduction** ........................................................................................................... **5**

**Parties** ..................................................................................................................... **10**

**Jurisdiction and Venue** ........................................................................................... **12**

**Introduction to the Major Financial Losses Caused by Excessive Physician Compensation** ......................................................................................................... **13**

**Kalispell Regional's Focus on Contribution Margins from Referrals by Physicians** ........... **15**

**Kalispell Regional Has Paid Physicians Based on Revenues from Referrals Generated by These Physicians to the Hospital System** ...................................... **26**
    **Overview of Excessive Physician Compensation in FY 2016** ........................................... **27**
    **Overview of Excessive Physician Compensation in FY 2015** ........................................... **28**
    **Overview of Excessive Physician Compensation in FY 2014** ........................................... **30**
    **Examples of Excessive Payments to Cardiologists and Cardiac Surgeons** ..................... **31**
    **Examples of Excessive Payments to Gastroenterologists** ................................................ **34**

Examples of Excessive Payments to Oncology Surgeons ................................................... 36
Examples of Excessive Compensation to General Surgeons ............................................ 48
Examples of Excessive Compensation to Orthopedic Surgeons ...................................... 50
Kalispell Regional Has Repeatedly Violated the *Stark* Law's Requirement that
Compensation of Employed Physicians Be Set in Advance ............................................. 52

Relator Has Repeatedly Objected to Physician Compensation at Kalispell Regional ......... 59

Kalispell Regional Has Violated Federal *Stark* Laws ......................................................... 61

The *Stark* Statute's Broad Definition of "Referral" ............................................................ 64

A Bona Fide Employment Relationship Must Satisfy Four Primary Requirements ........... 65
Physician Compensation Must be "Consistent with the Fair Market Value of the
Services" Personally Performed by the Physician ........................................................... 65
Physician Compensation Must Not be "Determined in a Manner that Takes into Account
(Directly or Indirectly) the Volume or Value of any Referrals by the Referring
Physician" ........................................................................................................................ 67
The *Stark* Statute Requires that Physician Compensation Must be "Commercially
Reasonable Even if No Referrals Were Made to the Employer" ..................................... 67

The Anti-Kickback Statute Also Mandates that a Hospital's Payments to an
Employed Physician Must be Consistent with the Fair Market Value of the
Physician's Services and Must Not Take Into Account the Volume or Value of
Referrals to the Hospital .................................................................................................. 68
Introduction to the Medicare Program ............................................................................ 70
Introduction to Medicaid Program .................................................................................. 76
Introduction to TRICARE ............................................................................................... 77

Introduction to the False Claims Act .................................................................................. 79

Certifying Compliance with the Federal *Stark* Laws and Anti-Kickback Statutes Is
Condition of Payment Under Federal Healthcare Programs and False Certifications
are Actionable under the False Claims Act ......................................................................... 81

Count I---Federal False Claims Act 31 U.S.C. Section 3729(a) (1)(A) .................................. 83

Count II---False Claims Act 31 U.S.C. 3729(a)(1)(B) Use of False Statements ..................... 84

Count III---Federal False Claims Act 31 U.S.C. § 3729(a)(1)(C) Conspiring to
Submit False Claims ........................................................................................................... 85

Count IV---Submission of Express and Implied False Certifications in Violation of
31 U.S.C. § 3729(a)(1)(B) .................................................................................................... 86

Count V---Knowingly Causing and Retaining Overpayments in Violation of 31
U.S.C. § 3729(a)(1)(G) ........................................................................................................ 87

Count VI---False Claims Act 31 U.S.C. 3729 (a)(1)(G) False Record to Avoid an
Obligation to Refund .......................................................................................................... 89

Prayers for Relief ................................................................................................................. 89

**Introduction**

1.      Under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended ("FCA"), Relator Jon Mohatt states his Complaint against Defendants Kalispell Regional Healthcare, Kalispell Regional Medical Center and John Does 1-100 (collectively referred to as "Kalispell Regional") filed under seal with the Court as follows.

2.      This *qui tam* case is brought against Kalispell Regional for knowingly defrauding the federal government in connection with Medicare, Medicaid, TRICARE, and other Federal Healthcare Programs. As alleged below, since at least 2011, Kalispell Regional has engaged in a scheme to pay improper compensation to certain employed physicians to reward or induce them illegally to refer patients, including Medicare patients, to Kalispell Regional hospitals and clinics.

3.      Kalispell Regional has excessively compensated specialists who are more profitable in producing ancillary hospital revenues. Such specialties include orthopedic surgery, general surgery, surgical oncology, neurosurgery, gastroenterology and cardiology discussed below.

4.      Revenues from perioperative services or ancillary revenues related to surgical procedures account for a major portion of annual profits at Kalispell Regional. Kalispell Regional's strategy includes multiple physician specialties discussed below, especially surgeons or specialists in position to order admissions for inpatient or outpatient surgeries, tests, services, and procedures.

5.      In determining compensation to such physicians, Kalispell Regional has paid such physicians not based simply on the value of their personal services and collections. Rather, Kalispell Regional has paid such physicians based in part on the value and volume of their referrals to the hospital system.

6.      Senior executives, including the CEO, have profited from this scheme to boost revenues because they are paid bonuses based in part on the financial performance of the hospital system.

7.      This scheme has been a lucrative strategy of mutual enrichment for Kalispell Regional, senior executives, and these employed specialists, and a deliberate violation of Federal *Stark* laws discussed below.

8.      With respect to most of these physicians, Kalispell Regional has entered into compensation contracts that are not based on any measure of calculating each physician's personal productivity. Their compensation and bonuses are not based on revenues collected for the physician's personal services.

9.      Rather the executive leadership at Kalispell Regional has agreed to pay such physicians based on the historical and projected value of referrals from each physician to the hospital system. Based on referrals, Kalispell Regional's executives have agreed to pay such specialists excessive base salaries plus bonuses.

10.     Most of these physicians do not work full-time schedules. At most, they work 4 days a week with 6-12 paid vacation weeks each year on average.  Kalispell Regional has created an extraordinary boondoggle of compensation for specialists with high referrals to the hospital system.

11.     The most common measure of physician productivity is Work Relative Value Units (wRVUs).  These units reflect the level of time, skill, training, and intensity required of a physician to provide a given service. These units are the leading method for calculating the volume of work or effort expended by a physician in treating patients. Under this relative scale, a physician seeing

two or three complex or high acuity patients per day would accumulate more RVUs than a physician seeing lower acuity patients each day.

12.     Kalispell Regional has paid many employed physicians, including primary care physicians, based on their personal wRVU production. Such compensation formula is the most common way for hospitals to pay employed physicians in the United States.

13.     Yet for specialists with high referrals, Kalispell Regional has not based physician compensation on wRVUs. Rather, Kalispell Regional has given them high compensation with no minimum requirements for wRVUs or any other measure of personal productivity.

14.     Kalispell Regional's executives knew that the over-compensated specialists were producing minimal wRVUs. The employed specialists discussed below have generally produced wRVUs at or below the national 25th percentile; however, they have been paid in excess of national 75th or 90th percentiles for part-time work.

15.     As discussed below, the part-time specialists have been commonly paid at a rate that if working full-time schedules would approach or exceed the national 90th percentile compensation benchmarks according to MGMA Physician Compensation and Production Survey Data.[1] As discussed below, the overall ratio of compensation to collections ratios for these physicians is extraordinary and extreme and generally in excess of the national 90th percentile.

---

[1]  The physician compensation percentiles quoted in this Complaint are compiled and published by the Medical Group Management Association that conducts the leading national surveys of physician compensation and productivity recognized in the health care industry.

16.     The impact of this scheme is harmful to patient care. The part-time work schedules of overpaid specialists make it difficult to schedule patient appointments and there have been long delays in scheduling appointments at Kalispell Regional. Moreover, such physicians know they are compensated at high levels to generate business and revenues for the hospital system through tests, admissions, procedures, surgeries, and other ancillary medical services. They are incentivized for overutilization of medical treatment.

17.     The overpaid specialists discussed below refer large volumes of patients, including Medicare and Medicaid patients, to Kalispell Regional hospitals and clinics. Kalispell Regional has submitted and continues to submit false or fraudulent claims based on these referrals to the United States to obtain millions of dollars in Medicare, Medicaid, and TRICARE payments that they were not legally entitled to receive.

18.     Payments from the Medicare Program account for approximately 32-34 percent of Kalispell Regional's net revenues each year. Payments from the Medicaid Program account for another 5-6 percent of net revenues each year. In the past 5 years, Kalispell Regional has received approximately $600 million in payments from the Medicare Program.

19.     Further, despite knowing that millions of dollars in payments from the Federal Government have been received in violation of the *Stark* statute's prohibition on receipt of payments, Kalispell Regional has failed to refund these payments as required by the *Stark* statute. Under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)(2009), this conduct constitutes a knowing and improper avoidance of an obligation to transmit money to the government.

20.     To conceal their unlawful conduct and to avoid refunding payments made on false claims, Kalispell Regional also falsely certified, in violation of the False Claims Act, that the services identified in its annual cost reports were provided in compliance with federal law, including the

prohibition against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications made with each annual cost report were part of Kalispell Regional's unlawful scheme to defraud federal healthcare programs.

21.     Prior to enactment of the *Stark* Laws, "there were a number of studies…that consistently found that physicians who had [financial relationships with]…entities to which they referred, ordered more services than physicians without those financial relationships…" 66 Federal Register 859 (January 4, 2001).  "This correlation between financial ties and increased utilization was the impetus for section 1877 of the Act." 66 Federal Register 859 (January 4, 2001).

22.     Recognizing the conflict of interest present when a physician refers a patient to a medical facility in which he or she has a financial relationship, the federal government has enacted laws and regulations designed to prevent the overutilization of healthcare services.

23.     The *Stark* laws prohibit the United States from paying for designated health services ("DHS") prescribed by physicians who have improper financial relationships with the DHS provider. In addition to prohibiting the hospital from submitting claims under these circumstances, the *Stark* Law also prohibits payments by Federal Healthcare Programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1).[2]

24.     A hospital employing and compensating a physician who refers patients covered by Federal Healthcare Programs to that hospital must satisfy the statutory exception for "bona fide

---

[2] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services...radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

employment relationships."

25.     Under the *Stark* Statute, a "bona fide employment relationship" must satisfy the following three relevant requirements: (1) "the amount of the remuneration under the employment...is consistent with the fair market value of the services" personally performed by the physician, (2) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (3) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2). All three of these requirements are mandatory under Federal *Stark* Laws.

26.     As discussed below, Kalispell Regional has deliberately and repeatedly violated all three of these requirements mandated by Federal *Stark* Laws.

27.     Under the federal False Claims Act, on behalf of the United States, Relator Jon Mohatt seeks to recover all available damages, civil penalties, and other relief arising from Kalispell Regional's conduct described in this Complaint.

## Parties

28.      Relator Jon Mohatt is the Chief Financial Officer (CFO) for the Physician Network at Kalispell Regional Healthcare in Kalispell, Montana.  KRH Physician Network operates under the corporate umbrella and control of Kalispell Regional Healthcare.

29.     At KRH Physician Network, Mr. Mohatt manages the financial operations for 46 medical practices consisting of over 220 medical providers and $100 million in net revenues.

30.     Through his work and experience, Relator has direct, detailed, and personal knowledge that Kalispell Regional has violated Federal *Stark* and Anti-Kickback Laws as described in detail

below.

31.    Defendant Kalispell Regional Healthcare is a 300-bed health care system located in Kalispell, Montana. Kalispell Regional treats more than 170,000 patients each year within a geographical region of 20,000 square miles and has approximately 3,000 employees. Comprising the health care system are two acute-care hospitals (Kalispell Regional Medical Center and The HealthCenter), a skilled nursing facility (Brendan House), a fitness facility (The Summit Medical Fitness Center), a mental health and substance abuse facility (Pathways Treatment Center), a durable medical equipment company (Kalispell Medical Equipment) and more than 20 primary and specialty physician clinics. Also included within the Kalispell Regional Healthcare corporate umbrella is Northwest Orthopedics and Sports Medicine.

32.    Kalispell Regional Medical Center includes the hospital and many departments under which employed physicians are organized according to specialty, including the following: Rocky Mountain Heart and Lung, Northwest Oncology and Hematology, Northwest Montana Surgical Associates, Northwest Montana Radiation Oncology, Northwest Hospitalists, Neuroscience and Spine Institute, KRH Surgical Specialists, and Kalispell Gastroenterology.

33.    The named Defendants Kalispell Regional Healthcare and Kalispell Regional Medical Center include all of the entities and departments identified in Paragraphs 32-33 above.

34.    The identities of the remaining Doe defendants who knowingly submitted or caused the submission of false claims to the United States are presently unknown to Relator. All listed Defendants and such additional Doe defendants have served as contractors, agents, partners, and/or representatives of one and another in the submission of false claims to the United States and were acting within the course, scope and authority of such contract, conspiracy, agency, partnership and/or representation for the conduct described below.

11

## Jurisdiction and Venue

35.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331,

28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on

this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

36.     Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and

1395(a) and 31 U.S.C. § 3732(a), as Defendants can be found, reside, transact business, or

otherwise engaged in the illegal conduct at issue within the District.

37.     This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known

as the False Claims Act which provides that the United States District Courts shall have exclusive

jurisdiction over actions brought under that Act.

38.     Section 3732(a) of the Federal False Claims Act provides, "Any action under section 3730

may be brought in any judicial district in which the defendant or, in the case of multiple defendants,

any one defendant can be found, resides, transacts business, or in which any act proscribed by

section 3729 occurred."

39.     Relator has filed this action within the 6-year statute of limitations under the False Claims

Act. As discussed below, this action seeks recovery under the False Claims Act for violations of

Federal *Stark* and Anti-Kickback Laws with respect to Kalispell Regional's claims for payment

by Federal Healthcare Programs at least from 2011 through the present.

40.     Prior to filing this case, Mr. Mohatt, through his counsel, delivered a draft copy of the

Complaint and his written disclosures of substantially all material evidence and information in his

possession to the United States Attorney's Office for the District of Montana.

12

**Introduction to the Major Financial Losses Caused by Excessive Physician Compensation**

41.     At least since 2011, Kalispell Regional has engaged in a scheme to pay excessive compensation to certain employed physicians to reward or induce them to refer patients, including Medicare patients, to Kalispell Regional hospitals and clinics. This scheme has caused major financial losses if revenues from referrals are not considered.

42.     Mr. Mohatt oversees the financial operations of the physician clinics that are a part of Kalispell Regional Healthcare. Mr. Mohatt has compiled detailed physician compensation and production data over Fiscal Years 2014-2016[3] for each of the clinics or physician specialties, including cardiology, orthopedic surgery, general surgery, neurosurgery, and radiation oncology.

43.     The data demonstrates the major financial losses from excessive physician compensation at Kalispell Regional. The physician clinics generated losses of 15.9 million in FY 2014, 18.8 million in 2015, and 22.8 million in 2016.

44.     When all clinic overhead costs are included, the estimated losses exceed $100 million in the last 5 years.

45.     Over the time period of FY 2014-2016, the employed physicians with the clinics generated collections of $60.3 million. Yet Kalispell Regional paid such physicians $91.8 million.

46.     The losses are actually understated in Kalispell Regional's accounting system. For example, the losses from the physician clinics were actually 29.7 million in FY 2015 when

---

[3] Kalispell Regional operates on a fiscal year ("FY") of April to March the following year. The year numbers used in this Disclosure generally refer to Kalispell Regional's fiscal years.

13

additional clinic overhead is included. Additionally, prior to 2016, expensive cancer infusion drugs were included in the clinic revenues despite the fact that they were not physician services.

47.     Yet the losses from excessive physician compensation are actually the key strategy to achieve offsetting hospital profits from physician referrals closely tracked by Kalispell Regional's executives, including the CEO.  For example, in FY 2015, the 29.7 million in losses were offset by hospital profits from referrals by employed physicians in the amount of $41 million.

48.     By way of example, Kalispell Regional paid employed cardiologists and pulmonologists at Rocky Mountain Heart and Lung at levels to generate losses of $5,107,795.00 in FY 2015. Kalispell Regional's executives planned for such losses while they tracked offsetting profits from referrals by such physicians in the amount of $6,968,305.00 in 2015. The hospital profits from referrals offset the $5.1 million in losses to reach a net gain of $1,860,510.00 in 2015 from the employed cardiologists.

49.     The losses generated by employed cardiologists are not limited to FY 2015. In 2014, they generated financial losses in the amount of 4.2 million. In FY 2016, they generated financial losses in the amount of 6.6 million.

50.     Among the patients being treated and referred by the employed cardiologists and pulmonologists, the Medicare Program covered approximately 51 percent of such patients.

51.     Kalispell Regional paid employed orthopedic surgeons at levels to generate losses of $3,069,440.00 in FY 2015. Kalispell Regional paid employed orthopedic surgeons at levels to generate losses of $2.79 in FY 2014 and $2.77 million in 2016.

52.      Kalispell Regional's executives planned for such losses while they tracked offsetting profits from referrals by such physicians in the amount of $4,707,360.00 in FY 2015. The hospital profits from referrals offset the $3.06 million in losses to reach a net gain of $1,637,920.00 in FY

2015 from the employed orthopedic surgeons.

53.     Among the patients being treated and referred by the employed orthopedic surgeons, approximately 21 percent of such patients were covered by the Medicare Program.

54.     Kalispell Regional paid employed general surgeons at levels to generate losses of $1,018,142.00 in FY 2015. Kalispell Regional's executives again planned for such losses while they tracked offsetting hospital profits from referrals by such physicians in the amount of $4,903,850.00 in FY 2015. The hospital profits from referrals offset the $1 million in losses to reach a net gain of $3,885,708.00 in FY 2015 from the employed surgeons. As discussed below, due to significant referral profits from employed general surgeons, these specialists have received exceptional compensation and modest work requirements from Kalispell Regional.

55.     Kalispell Regional paid employed neurosurgeons and spine surgeons at levels to generate losses of $4,220,743.00 in FY 2015. Kalispell Regional's executives planned for such losses while they tracked offsetting profits from referrals by such physicians in the amount of $4,530,002 in FY 2015. The hospital profits from referrals offset the $4.2 million in losses to reach a net gain of $309,259.00 in FY 2015 from the employed neurosurgeons and spine surgeons.

### Kalispell Regional's Focus on Contribution Margins from Referrals by Physicians

56.     Kalispell Regional's CEO, Velinda Stephens, has regularly requested reports that track the volume and value of referrals from all employed physicians. For many years she has requested such reports from the hospital's cost accountant, Chris Hassler.

57.     Hassler has frequently provided the CEO and CFIO with reports of hospital profits from referrals by each physician dating back to at least 2009.

58.     For example, in 2009, Hassler ran a report for Stephens that tracked the volume and value of referrals from every employed physician in FY 2007.

59.     In 2013, Hassler prepared a report for Stephens that listed the top 25 physicians according to gross revenues from referrals by such physicians to Kalispell Regional. The report also listed gross revenues from referrals by other employed physicians.

60.     In 2015, Hassler prepared a report for Stephens that listed the volume and profits from referrals by employed neurosurgeons to the Kalispell Regional.

61.     In 2015, Hassler also prepared a report for Stephens that listed the volume and profits from referrals by employed orthopedic surgeons and a report that listed the volume and profits from referrals by employed general surgeons to Kalispell Regional.

62.     Stephens has led an accounting scheme of tracking, projecting, monitoring, and rewarding "contribution margins" from employed specialists discussed in this Complaint. Such contribution margins are the hospital profits from referrals by each physician. Based on historical and future projected profits from referrals by each physician to Kalispell Regional, Stephens has determined physician compensation packages.

63.     This scheme dates back to at least 2011 and reveals why Kalispell Regional has deliberately chosen to compensate physicians at excessive levels that incentivize referrals to justify such compensation.

64.     For example, in May of 2011, Stephens instructed Perry Howell, the Chief Financial Officer of the Medical Practice Division, to provide her with the contribution margins from referrals by two oncology surgeons, Dr. Sheldon and Dr. Lillard.

65.     On May 24, 2011, Howell sent an email to Chris Hassler that referenced "Velinda request." (Velinda Stephens is the CEO).

66.     Hassler provided the contribution margins and then Howell asked for the "same information for April this year compared to April last year."

67.     Hassler asked, "Is this something you're going to need every month?" Howell answered, "yes."

68.     Hassler asked "why these two particular docs (just out of morbid curiosity)?" Howell answered, "They are kinda her pets so she wants to prove they are doing well. Besides they are the surgical oncologists which are more expensive and should be bringing in more hospital revenue."

69.     Stephens' "pet" project was tracking contribution margins from surgical specialists because such referral revenues have been a major source of hospital profits at Kalispell Regional. The contribution margins for Dr. Sheldon showed his referrals from surgeries brought $1,916,125 in profits to the hospital for the previous fiscal year.

70.     In October of 2011, Stephens requested the contribution margins for a gastroenterologist , Dr. Yacovone, who performs surgical procedures for the time period of June through August, 2011.

71.     In October of 2011, Howell made the same request for the contribution margin data on another surgeon, Dr. Hulvat.

72.      Kelly Gallipeau, the Practice Manager for Northwest Montana Surgical Associates, was preparing a PowerPoint presentation for the Board that would show contribution margins for this surgeon. Northwest Montana Surgical Associates is a Department of Kalispell Regional Medical Center.

73.     The contribution margins or revenues from referrals by employed surgeons have been a monthly focus for senior executives at Kalispell Regional, including the CEO.

17

74.    In November of 2011, Howell and Hassler exchanged emails again regarding the contribution margins of Dr. Sheldon. Hassler provided the contribution margins for Dr. Sheldon for FY 2011 and FY 2012 that showed his referrals generated profits for Kalispell Regional Medical Center in the amount of $3,161,227 in 2011. Howell responded by asking for "the same analysis but for September 2009 through August 2010 and September 2010 through August 2011."

75.    On February 7, 2012, Hassler sent an email to Howell regarding "surgeon volume and net revenue by specific practice by facility-Velinda request." Hassler wrote, "The attached includes the volume data Velinda requested plus the net revenue for you and Dr. Eddy."

76.    This data requested by Stephens tracked the contribution margins for every surgeon employed by Kalispell Regional. The data included the number of cases for each surgeon and the net revenues to the hospital from referrals by each surgeon for FY 2011 and FY 2012 as of December 2011.

77.    On July 9, 2012, Hassler sent an email to Howell and Jack Bell in which he analyzed the contribution margins from the employed neurosurgeons.

78.    Such analyses examined the "neurosurgery inpatient profitability" and volumes of surgeries for every employed neurosurgeon for three different six-month time periods in 2010, 2011, and 2012.

79.    On April 25, 2013, Hassler sent an Excel spreadsheet to Howell that listed the contribution margins for each employed surgeon, including the net revenue to Kalispell Regional Medical Center from referrals by each physician over the previous five years. Stephens used this data to evaluate and determine updated compensation levels for each surgeon.

18

80.    On July 2, 2013, Howell sent an email to Hassler in which he stated, "Chris, I can't remember if I sent you an email but I direly need the last three fiscal years worth of hospital information down to bottom line for RMHL, Neurosurgery and Northwest Orthopedics."

81.    On behalf of Stephens, Howell was again requesting contribution margin data or the value of referrals from employed cardiologists, pulmonologists, neurosurgeons, and orthopedic surgeons. Stephens requested such referral data for the last three fiscal years so that she could monitor profits from referrals by each of these specialists, evaluate whether such physicians were increasing referrals to the hospital over the three-year period, and determine their updated compensation based in part on the value of such referrals to Kalispell Regional.

82.    On July 8, 2013, Hassler provided the data requested by Howell and Stephens. Hassler wrote, "Attached is the data you requested---just a note on the FY13 information---I had to estimate contractuals for the A/R and the costs might change somewhat after I recalculate FY13 but it should be really close."

83.    Howell made changes to the data and returned to Hassler. The following day Hassler emailed the updated data back to Howell with Howell's changes. Hassler put the contribution margins for cardiologists and pulmonologists on a separate page.

84.    The data tracked by Howell and Stephens showed that the orthopedic surgeons generated contribution margins or hospital profits from referrals in the amount of $2,738,011.00 in FY 2011, $3,039,656.00 in FY 2012, and $3,445,608.00 in FY 2013.

85.    The data tracked by Howell and Stephens showed that the neurosurgeons generated contribution margins or hospital profits from referrals in the amount of $1,846,277 in FY 2011, $2,999,246 in FY 2012, and $5,000,276 in FY 2013.

86.     The data tracked by Howell and the CEO showed that the cardiologists and pulmonologists generated contribution margins or hospital profits from referrals in the amount of $7,194,716.00 in FY 2011, $9,611,084.00 in FY 2012, and $10,440,092.00 in FY 2013.

87.     Since at least 2011, Stephens and Howell have regularly monitored the value and volume of referrals from employed specialists and used such data to determine physician compensation offered and paid by Kalispell Regional.

88.     On July 31, 2013 Hassler sent another report to Perry Howell and Linda Sauer regarding the value of referrals from employed neurosurgeons. The email subject is "Neuro update for meeting."

89.     Hassler's report provided the contribution margins or hospital revenues from referrals by the neurosurgeons for the fiscal years 2011, 2012, and 2013.

90.     Due to Kalispell Regional's scheme to reward referrals and pay physicians based on the value of referrals, the contribution margins from employed neurosurgeons increased from $1,846,277.00 in FY 2011 to $2,999,246.00 in FY 2012 and then to $5,000,276.00 in FY 2013. Hassler provided all of these numbers in his email to Perry Howell and Linda Sauer.

91.     Kalispell Regional's executives regularly tracked and monitored the value of referrals from employed neurosurgeons and used such referral numbers to determine compensation to such surgeons. Such referral revenues were the only economic basis of the employment contracts that did not require any minimum level of physician production or physician wRVUs.

92.     Kalispell Regional followed the same scheme with every group of specialists. On July 31, 2013, after receiving the analyses of referral revenues from neurosurgeons, Perry Howell sent an email back to Chris Hassler and Linda Sauer in which he said, "Chris, the next one we need as soon as possible would be Rocky. Thanks, Perry."

93.     "Rocky" refers to "Rocky Mountain Heart and Lung" which is the group of cardiologists and pulmonologists employed by Kalispell Regional.

94.     In August of 2013, Howell also requested the contribution margins or referral profits from employed orthopedic surgeons.  On August 6, 2013, Hassler sent an email to Howell in which he apologized for only including inpatient revenues from referrals by the employed orthopedic surgeons. Hassler stated in his email, "I was looking at inpatient cases at NOSM---I'm mortified. There's a ton of outpatient business and I will update the margin reports shortly---when is your meeting with NOSM?"

95.     Perry Howell responded, "I believe we have next Wednesday. Thanks, Perry."

96.     On August 12, 2013, Hassler sent revised reports to Howell that listed the hospital profits from inpatient and outpatient referrals by the employed orthopedic surgeons to Kalispell Regional for the fiscal years 2011, 2012, and 2013.

97.     Howell requested this information prior to the meeting with the orthopedic surgery group for one reason: to monitor and push the surgeons for more referrals as the basis of their compensation and employment contracts that did not require any minimum level of work or personal productivity.

98.     The contribution margin reports regularly compiled by Hassler and monitored by Stephens demonstrated that Kalispell Regional's scheme was effective in increasing hospital revenues from referrals by the employed orthopedic surgeons.

99.     In FY 2011, hospital profits from referrals by the employed orthopedic surgeons totaled $4,795,420.

100. One year later in FY 2012, hospital profits from referrals by the employed orthopedic surgeons totaled $5,475,877. And in FY 2013, hospital profits from referrals by the employed orthopedic surgeons totaled $6,411,064.

101. These hospital profits were listed in Hassler's report after calculating the net revenues from referrals and the costs of treatment associated with the referrals by the employed orthopedic surgeons. *Id.*

102. Kalispell Regional's excessive compensation of employed orthopedic surgeons discussed below was a calculated profiteering scheme to incentivize referrals that more than offset the costs of excessive compensation.

103. In September of 2013, executives at Kalispell Regional continued to track referral profits. For example, Hassler sent an email to Howell regarding hospital profits from referrals by two surgeons, Dr. Sheldon and Dr. Lillard.

104. Hassler's email addressed hospital profits from referrals by these two surgeons for the 12 months ending June 30, 2013. Dr. Sheldon referred 205 cases to the hospital with a hospital profit margin of $971,400.00 and Dr. Lillard referred 132 cases to the hospital with a hospital profit of $656,500.00. *Id.* Hassler also included the payor mix for the hospital profits: 53.2 percent of Dr. Sheldon's referrals were Medicare patients and 39.4 percent of Dr. Lillard's referrals were Medicare patients.

105. On September 19, 2013, Hassler sent an email to Howell with an Excel spreadsheet. The Excel spreadsheet listed hospital profits from referrals by Dr. Sheldon, Dr. Lillard, and seven other surgeons in Northwest Montana Surgical Associates for the 12 months ending June 30, 2013.

106. This group of employed surgeons generated hospital profits from referrals to Kalispell Regional in the amount of $3.52 million over this 12-month period. The Excel spreadsheet listed

22

the number of cases referred by each surgeon to the hospital, the gross hospital revenues from referrals by each surgeon, the net hospital revenues from referrals by each surgeon, the total hospital costs of treatment from the referrals by each surgeon, and the net hospital profits or "margins" from referrals by each surgeon.

107.   Stephens used this Excel spreadsheet to monitor referrals and to determine physician compensation based on past and projected hospital profits from referrals by each surgeon.

108.   Stephens also used this Excel spreadsheet to confirm that the scheme of paying high compensation to physicians without personal productivity requirements was profitable based on the value of hospital profits from referrals by the physicians.

109.   On that same date, Howell called a meeting with Hassler in his office to discuss "surgeon stuff." The "stuff" was hospital profits from referrals by each surgeon.

110.   The scheme to control and increase referrals by over-compensating employed physicians is ongoing at Kalispell Regional.

111.   On July 18, 2016, Mohatt attended a Kalispell Regional Healthcare Physician Network (KRHPN) Business Meeting at the Administrative Conference Room. In attendance also were Dr. Patrick Rankin, Chief Physician Executive, Dr. John Tollerson, CMIO, Gary Chalfant, KRHPN Director of Operations, and Diane Kivela, KRHPN Operations Manager.

112.   Stephens interrupted the meeting. Stephens wanted to show the group several graphs from a report she has updated every fiscal year depicting the amount of hospital revenue from physician referrals in surrounding counties.

113.   She pointed out that referral revenues were up in most of the counties, especially Lake and Lincoln counties. She said that "controlling" or employing key physicians in these counties had generated major increases in referrals and major increases in revenues to the hospital system.

Stephens pointed out that Kalispell Regional has employed Dr. Stein (Family Medicine Clinic) and Dr. Bell (Ob/Gyn) in Lincoln County and Dr. Rausch (Family Medicine Clinic) in Lake County. She said these employment relationships generated increased referrals to the hospital system from the respective counties where these physicians practice.

114.   She showed several graphs demonstrating increasing hospital revenues from increasing referrals in these counties over the last 5 years. In the PowerPoint presented by Stephens, she showed Slide 19 that tracked net hospital revenues from referrals in Lake County. Net revenues from referrals in Lake County increased from 7.7 million in 2011 to 12.7 million in 2015.

115.   Stephens also presented Slide 20 that tracked net hospital revenues from referrals in Lincoln County. Net revenues from referrals in Lincoln County increased from 14.3 million in 2011 to 24.2 million in 2015.

116.   The PowerPoint presented by Stephens also included confirmation that Kalispell Regional's scheme to increase referrals has been effective to increase surgeries, inpatient admissions, and net revenues.

117.   Stephens presented Slide 3 that showed surgeries in the Kalispell Regional system moving from 10,814 surgeries in FY 2012 to 11,160 surgeries in FY 2013, 11,348 surgeries in FY 2014, 12,397 surgeries in FY 2015, and 12,937 surgeries annualized in FY 2016.

118.   With respect to inpatient discharges, 2015 and 2016 were the highest years with 11,008 discharges in 2015 and 11,300 projected discharges for 2016.  Patient discharges had increased from 9,909 in 2014.

119.   Kalispell Regional's illegal scheme has been effective to increase net revenues. In Slide 24, Stephens presented a graph showing net revenues rising from $230.2 million in 2011 to $270.7 million in 2012, $298.5 million in 2013, $319.5 million in 2014, and $356.1 million in 2015.

120. On July 21, 2016, Mohatt was called into a meeting to discuss an employment Letter of Intent (LOI) for a Libby, Montana (Lincoln County) general surgeon named Dr. Lance Ercanbrack. The meeting was in the Administrative Conference Room.

121. Also in attendance were Velinda Stephens, CEO, Tate Kreitinger, North Valley Hospital and HealthCenter CEO, Randy Nightengale, North Valley Hospital CFO (via telephone), and Dr. Patrick Rankin, Chief Physician Executive

122. Nightengale was tasked with preparing a pro forma for a new clinic in Libby where Dr. Ercanbrack would be employed by KRMC or Cabinet Peaks Medical Center in Libby. After initial analysis by Nightengale and Mohatt, they both recommended that Dr. Ercanbrack should be employed by Cabinet Peaks. The CEO of Cabinet Peaks, Bruce Whitfield, was also in agreement. Stephens heard this recommendation and disagreed. She wanted him employed by KRMC.

123. Mohatt and the others in attendance were all reading the initial Letter of Intent drafted with Dr. Ercanbrack being employed by Cabinet Peaks when Stephens said that "we need to amend" the Letter of Intent and get a draft copy out to Dr. Ercanbrack today because he "has waited on us long enough." Stephens said that Kalispell Regional "needed" to employ him in order to "maintain control" and keep all the referrals coming to KRMC as she wanted the increased referrals from Lincoln County to continue.

124. Stephens further stated that she wanted to increase the employment offer from $310,000.00 as recommended by Nightengale and Mohatt based on his historical salary as an independent physician, to $350,000.00 because "we made him wait so long" to get a letter of intent.

125. Mohatt expressed that this salary would be out of line with historical production, historical salary information, and the pro forma. With this offer the clinic will lose money based on the

professional fees earned by the physician. Stephens ignored the losses and focused on the projected revenues from referrals by Dr. Ercanbrack to Kalispell Regional.

126. On July 21, 2016, Kalispell Regional sent a Letter of Intent to Dr. Ercanbrack. His salary was $350,000 as demanded by Stephens.

## Kalispell Regional Has Paid Physicians Based on Revenues from Referrals Generated by These Physicians to the Hospital System

127. There is extensive evidence of Kalispell Regional's strategy to pay physicians not based on their personal productivity, but based in part on revenues generated from referrals by such physicians to the hospital system.

128. Kalispell Regional employs over 50 specialists who are not required to produce any minimal wRVUs. These physicians are compensated at high levels with no relationship to their personal productivity or the collections for their personal services. None of these physicians is required to work a full-time schedule. Kalispell Regional has agreed to such contract terms because all of these physicians are clinical decision-makers with opportunities to make substantial referrals. In determining their compensation, Kalispell Regional's executives analyzed the value and volume of their past or projected referrals to Kalispell Regional hospitals and clinics. From such analyses, Kalispell Regional projected future revenues from referrals and based physician compensation on such projected referrals.

129. The MGMA physician compensation survey data is based on a physician full-time equivalent (FTE) equal to 36 clinical hours a week or 4.5 days in clinic with the assumption that the other .5 day is administrative time. The MGMA physician compensation data also assumes 4-5 weeks of Personal Time-Off (PTO).

26

130.   Yet the Kalispell Regional physicians at issue generally have 6-10 weeks of PTO and only 4 days or less of work per week in clinic or surgery. In one meeting with physicians, Stephens stated, "I don't care how much you work or don't work." The low work hours and low personal productivity of employed physicians reflect her attitude.

131.   Mohatt has compiled detailed data for physicians compensated by Kalispell Regional at levels in excess of national 90th percentile benchmarks for the time period of FY 2014-2016. The primary benchmark used to compile this list was physicians with full time equivalent compensation or compensation to collections ratios in excess of the national 90th percentile according to MGMA physician compensation data. The data reveals Kalispell Regional's extensive scheme to pay specialists not based on their production or collections or personal services, but based on profits from referrals and business generated for the hospital system.

## Overview of Excessive Physician Compensation in FY 2016

132.   In FY 2016, there were at least 34 employed physicians with full time equivalent cash compensation or compensation to collections ratios above the national 90th percentile for their specialty.

133.   These physicians generally had minimal or moderate personal productivity and minimal collections for personal services, yet they have received extraordinary levels of compensation paid by Kalispell Regional based on the value of ancillary revenues from their referrals to the hospital system. Relator has provided detailed financial data to the Department of Justice regarding the excessive compensation to all 34 employed specialists being compensated at such extreme levels.

134.   Only 5 of these 34 physicians had any required productivity thresholds under their employment contracts with Kalispell Regional.

135.   All of these 34 physicians were clinical decision-makers with power to generate significant ancillary revenues to Kalispell Regional.

136.   These 34 physicians generated collections of $9.04 million in FY 2016. Yet Kalispell Regional paid them cash compensation in the amount of $14.3 million.  At a loss of $5 million, Kalispell Regional paid these physicians in excess of the national 90th percentile benchmarks.

137.   Relator has performed a detailed analysis of how many days each of these physicians actually worked in FY 2016.  Only 3 of these 34 physicians were required to work full-time under their employment contracts with Kalispell Regional. Only 2 of the 34 physicians actually worked a full-time schedule. The other 32 physicians generally worked far less and Relator has provided the detailed data of days actually worked by each of the 34 physicians to the Department of Justice.

138.   Considering that only 2 of the 34 physicians actually worked a full-time schedule, their collective full-time equivalent compensation was $39.7 million as compared to the national 90th percentile for these specialties that was $30.03 million.  Collectively these physicians were compensated at a level approximately $9.7 million over the national 90th percentile.

139.   The collective collections for these 34 physicians were just above the national 10 percentile. Their collective wRVUs were below the national 10th percentile.

140.   Overall the compensation to collections ratio for these 34 physicians was approximately double the national 90th percentile.  Their compensation per wRVU was 1.76 times the national 90th percentile.

**Overview of Excessive Physician Compensation in FY 2015**

141.   In FY 2015, there were at least 36 employed physicians with full time equivalent cash compensation or compensation to collections ratios above the national 90th percentile for their specialty.

28

142.    These physicians generally had minimal or moderate personal productivity and minimal collections for personal services, yet they have received extraordinary levels of compensation paid by Kalispell Regional based in part on the value of ancillary revenues from their referrals to the hospital system. Relator has provided detailed financial data to the Department of Justice regarding the excessive compensation to all 36 employed specialists being compensated at such extreme levels.

143.    Only 7 of these 36 physicians had any required productivity thresholds under their employment contracts with Kalispell Regional.

144.    All of these 36 physicians were clinical decision-makers with power to generate significant ancillary revenues to Kalispell Regional.

145.    These 36 physicians generated collections of $12.8 million in FY 2015. Yet Kalispell Regional paid them cash compensation in the amount of $17.1 million. At a loss of $4.3 million, Kalispell Regional paid these physicians in excess of national 90th percentile compensation benchmarks.

146.    Only 4 of these 36 physicians were required to work full-time schedules under their employment contracts with Kalispell Regional.

147.    Overall their full-time equivalent compensation based on their employment contracts was between the national 75th and 90th percentiles. Their actual days worked were less than the work days required under their employment contracts so their actual full-time equivalent compensation was in excess of the national 90th percentile.

148.    The collective collections for these 36 physicians were just above the national 10 percentile and far below the national 25th percentile.

29

149.   Overall the compensation to collections ratio for these 36 physicians was 2.52 times the national 90th percentile.  Their overall compensation per wRVU was 1.35 times the national 90th percentile.

**Overview of Excessive Physician Compensation in FY 2014**

150.   In FY 2014, there were at least 27 employed physicians with full time equivalent cash compensation or compensation to collections ratios above the national 90th percentile for their specialty.

151.   These physicians generally had minimal or moderate personal productivity and minimal collections for personal services, yet they have received extraordinary levels of compensation paid by Kalispell Regional based on the value of ancillary revenues from their referrals to the hospital system. Relator has provided detailed financial data to the Department of Justice regarding the excessive compensation to all 27 employed specialists being compensated at such extreme levels.

152.   Only 5 of these 27 physicians had any required productivity thresholds under their employment contracts with Kalispell Regional.

153.   All of these 27 physicians were clinical decision-makers with power to generate significant ancillary revenues to Kalispell Regional.

154.   These 27 physicians generated collections of $8.7 million in FY 2014. Yet Kalispell Regional paid them cash compensation in the amount of $12.7 million.  At a $4 million loss, Kalispell Regional paid these physicians in excess of the national 90th percentile benchmarks.

155.   Only 3 of these 27 physicians were required to work full-time schedules under their employment contracts with Kalispell Regional.

156.   Overall their full-time equivalent compensation based on their employment contracts was at the national 90th percentile.  Their actual days worked were less than the work days required

under their employment contracts so their actual full-time equivalent compensation was in excess of the national 90th percentile.

157. The collective collections for these 27 physicians (9.1 million) were just over the national 10 percentile (8.5 million).

158. Overall the compensation to collections ratio for these 27 physicians was 1.48 times the national 90th percentile.

159. The following provides specific examples of excessive physician compensation by Kalispell Regional in FY 2014, 2015, and 2016.

### Examples of Excessive Payments to Cardiologists and Cardiac Surgeons

160. Dr. Colombowala is a cardiac electrophysiologist. In FY 2016, he was employed 5 months and only worked .10 of full-time equivalent employment. Yet Kalispell Regional paid him $311,804. His full-time equivalent compensation was $3,167,286---over three times the national 90th percentile of $971,400.

161. Dr. Brunson is also a cardiac electrophysiologist employed by Kalispell Regional. In FY 2016, he was employed 7 months and only worked .26 of full-time equivalent employment during those 7 months. Yet Kalispell Regional paid him $323,688. His actual full-time equivalent compensation was $2,337,222---approximately 2.4 times the national 90th percentile of $971,400. His employment contract required him to work more---.44 of full-time equivalent employment. But even under his contract terms, his full-time equivalent compensation was $1,373,436.

162. Dr. Steven Goldberg is an invasive cardiologist. His employment contract only required him to work .49 of a full-time schedule. In FY 2016, he actually worked .23 of a full-time schedule. His wRVUs of 2,560 were far below the national 10th percentile of 4,903. His collections for 2016 were only $119,630 as compared to the national 10th percentile of $216,470. Despite working only

.23 of full-time employment, Kalispell Regional paid him cash compensation of $351,640. His full-time equivalent compensation was $1,542,675 or approximately double the national 90th percentile which was $740,516.

163.   His compensation to collections ratio was 2.9 as compared to the national 90th percentile of 1.8.

164.   Dr. Richard Goulah is an invasive cardiologist. In FY 2016 his wRVUs of 1,667 were far below the national 10th percentile of 4,903.   His collections in 2016 were only $107,176 as compared to the national 10th percentile of $216,470. Despite his low productivity and the low collections for his personal services, Kalispell Regional paid him cash compensation of $406,008 in 2014. His compensation to collections ratio was 3.78 or approximately double the national 90th percentile of 1.88.

165.   Dr. Thomas Amidon is another invasive cardiologist employed by Kalispell Regional. He was employed for 4 months in FY 2016 and his actual days worked were .09 of full-time equivalent employment. Yet Kalispell Regional paid him $392,244. His annualized compensation was $1,176,731 and his full-time equivalent compensation was 4.3 million or over 5 times the national 90th percentile for invasive cardiologists ($740,516).

166.   In FY 2016 a noninvasive cardiologist, Dr. Sharon Heckler, only produced 951 wRVUs as compared to the national 10th percentile of 3,881. The collections for her personal services were only $68,779---far below the national 10th percentile. Her employment contract required her to work .77 of a full-time schedule, but she only worked .48.    There were no productivity requirements in her contract. Despite collections of only $68,779 for her services, Kalispell Regional paid her $250,021 in cash compensation in FY 2016. Her compensation to collections ratio was 3.62 as compared to the national 90th percentile of 2.011.

167.   In FY 2014 another noninvasive cardiologist, Dr. Neshe North, worked 10 months at Kalispell Regional. Her employment contract required her to work only .22 of a full-time schedule. Her collections and wRVUs were below the national 10th percentile. Kalispell Regional paid her cash compensation of $249,598. Under employment contract, her full-time equivalent compensation was $1,343,401---over double the national 90th percentile of $636,982.

168.   In FY 2016 Kalispell Regional paid $834,149 to Dr. Drew Kirshner, a cardiovascular surgeon.  He worked .71 of full-time employment. His full-time equivalent compensation was $1,172,399 as compared to the national 90th percentile compensation of $1,159,300 for cardiovascular surgeons. His collections were only $362,668. His compensation to collections ratio was 2.3 as compared to the national 90th percentile of 2.0.

169.   In FY 2014 Kalispell Regional paid $685,574 to Dr. Kirshner, a cardiovascular surgeon. His collections were only $273,400---below the national 10th percentile. His compensation to collections ratio was 2.50 as compared to the national 90th percentile of 1.713.

170.   Kalispell Regional paid another cardiovascular surgeon, Dr. Glatterer, at excessive levels in FY 2016. He was employed 6 months and his employment contract only required him to work .20 of a full-time schedule. His actual days worked were .13 of a full-time schedule. Kalispell Regional paid him $204,299 in FY 2016. Considering he only worked 6 months, his annualized compensation was $408,597. Considering that he worked only .13 of a full-time schedule, his full-time equivalent compensation was $1,584,495---far above the national 90th percentile of $1,159,300.

171.   His compensation to collections ratio was 3.2 as compared to the national 90th percentile of 2.0.

172.   In FY 2014, Kalispell Regional also paid Dr. Glatterer at excessive levels. He was employed 12 months and his employment contract only required him to work .20 of a full-time schedule. Kalispell Regional paid him $344,502 in 2016.

173.   Considering that his employment contract required him to work only .20 of a full-time schedule, his full-time equivalent compensation was $1,732,765---far above the national 90th percentile of $947,362.

174.   His compensation to collections ratio was 2.97 as compared to the national 90th percentile of 1.71.

175.   Kalispell Regional paid another cardiovascular surgeon, Dr. Walter Graves, at excessive levels. He was employed 3.5 months in 2016. His contract only required him to work .17 of a full-time schedule. His actual work days were only .03 of a full-time schedule. Despite collections for his personal services of only $10,941, Kalispell Regional paid him $117,310.  Considering he only worked 3.5 months, his annualized compensation was $402,207.

176.   Considering that he only worked .03 of a full-time schedule, his full-time equivalent compensation was 3.8 million---over three times the national 90th percentile of $1,159,300 for cardiovascular surgeons.

177.   His compensation to collections ratio was an extraordinary 10.7 as compared to the national 90th percentile of 2.0.

## **Examples of Excessive Payments to Gastroenterologists**

178.   Dr. Kevin Webb is a gastroenterologist employed by Kalispell Regional. He was employed for 5 months in FY 2016. His employment contract required him to work only .32 of full-time employment. He actually worked only .12 of full-time employment.

179.   His wRVUs were only 2,434 and annualized at 4173----far below the national 10th percentile of 5,337 for gastroenterologists.

180.   Kalispell Regional paid him $196,639 in cash for 2016. Considering that he only worked 5 months, his annualized compensation was $471,934. Considering that he only worked .12 of a full-time schedule, his actual full-time equivalent compensation was $1,621,411. The national 90th percentile compensation for gastroenterologists was $959,093.

181.   His compensation to collections ratio was 2.0 as compared to the national 90th percentile of 1.051.

182.   In FY 2015 he was employed for 7 months in 2016. His employment contract required him to work only .78 of full-time employment. He actually worked only .38 of full-time employment.

183.   His wRVUs were only 901 and annualized at 2162----far below the national 10th percentile of 5,694 for gastroenterologists.

184.   Kalispell Regional paid him $306,005 in cash for working a part-time schedule over 7 months in 2015. Considering that he only worked 7 months, his annualized compensation was $524,579. Considering that he only worked .38 of a full-time schedule, his actual full-time equivalent compensation was $1,391,114. The national 90th percentile compensation for gastroenterologists was $854,424.

185.   His compensation to collections ratio was 1.448 as compared to the national 90th percentile of 1.038..

186.   In FY 2016, another gastroenterologist, Dr. Nicholas Costrini, was required to work .86 of full-time employment under his contract with Kalispell Regional. He only worked .62 of full-time employment over 11 months. His wRVUs and collections were far below the national 10th percentile. Nevertheless, for part-time work, Kalispell Regional paid him cash in the amount of

$589,046. His actual full-time equivalent cash compensation was $1,077,760---as compared to the national 90th percentile compensation in the amount of $959,093. The collections for his services were only $301,377 and his compensation to collections ratio was 1.955 as compared to the national 90th percentile of 1.051.

187. In FY 2014, another gastroenterologist, Dr. Robert Yacavone, was required to work only .78 of full-time employment under his contract with Kalispell Regional. His wRVUs fell between the national 10th and national 25th percentiles. Kalispell Regional paid him cash compensation in the amount of $865,515. Under his contract terms, his full-time equivalent compensation was $1,105,413---as compared to the national 90th percentile of $848,342. His compensation to collections ratio was 1.26 as compared to the national 90th percentile of 1.005.

188. In FY 2015, Dr. Robert Yacavone was required to work only .57 of full-time employment under his contract with Kalispell Regional. He actually worked only of .41 of a full-time schedule for 10 months. His wRVUs fell below the national 10th percentile. Kalispell Regional paid him cash compensation in the amount of $617,524. Under his contract terms, his full-time equivalent compensation was $1,076,421---as compared to the national 90th percentile of $854,424. Based on his actual work schedule, his full-time equivalent compensation was $1,503,815.

189. His compensation to collections ratio was 1.25 as compared to the national 90th percentile of 1.038.

## Examples of Excessive Payments to Oncology Surgeons

190. Kalispell Regional paid oncology surgeon, David Sheldon, cash compensation in the amount of $663,822 in FY 2016 ending March 31, 2016.

36

191.   He was only required to be "available" for work 4 days per week under his employment contract. His contract full-time equivalent compensation was \$847,816---far in excess of the national 90th percentile compensation for oncology surgeons which was \$681,288

192.   When his cash compensation is annualized to account for the fact that he actually worked .82 of full-time employment, his full time equivalent cash compensation reaches \$812,067.

193.   His compensation to collections ratio was 1.31 as compared to the national 90th percentile of 1.18.

194.   A review of Dr. Sheldon's employment contract with Kalispell Regional reveals reasons that his compensation bears no relationship to his personal production.

195.   Although the Employment Agreement states Dr. Sheldon is "employed on a 'Full-Time' basis," the Agreement only requires him to be "readily available to deliver SERVICES to patients on behalf of HOSPITAL four (4) days per week, forty-six (46) weeks per year." *See* Employment Agreement, Section 1.1.

196.   Under the Employment Agreement from December 2013, his compensation was "an annual base" of \$460,000 plus a performance bonus of \$90,000. *See* Exhibit B to Physician Employment Agreement of Dr. Sheldon. There are no criteria listed for Dr. Sheldon's performance bonus. Kalispell Regional also agreed to pay Dr. Sheldon extra "call pay."

197.   This guaranteed compensation of \$550,000 is right at the national 90th percentile for oncology surgeons and he was not required to work full time, he was not required to produce any level of wRVUs, he was not required to generate any level of collections for his personal services, and he was not required to work any set hours. He was simply required to be "readily available" four days a week for 46 weeks of the year.

198.   There were no requirements in the Employment Agreement regarding his personal production or collections for his services.

199.   Dr. Sheldon's actual days worked in 2015 and 2016 were low. In 2015, he worked an average of 6.5 days a month in the clinic. In 2016, he worked an average of 7.1 days a month in the clinic.

200.   Despite his minimal personal production and collections for his services, in November of 2015, Kalispell Regional gave Dr. Sheldon a raise to $500,000 base salary plus a $100,000 performance bonus.

201.   In this Amended Agreement, there were no wRVU requirements for Dr. Sheldon. There are no requirements connected to his personal production or collections for his services. Under the Amended Contract terms, Dr. Sheldon is still not even required to work any set hours. He's simply required to be "readily available" four days a week for 46 weeks of the year

202.   The bonus is for unspecified "mutually agreed upon performance objectives." *See* Paragraph 1.b of Exhibit B.

203.   The truth is that the performance objective used by the CEO to give bonuses to employed specialists is revenue from referrals by such physicians to Kalispell Regional.

204.   Even with the financial losses from his practice and the low collections for his personal services, Kalispell Regional has given Dr. Sheldon the maximum bonus each year. The reason is revenues from referrals.

205.   Another oncology surgeon, Dr. Neil Wilkinson, has an employment contract with Kalispell Regional that requires him to work 15 days per month. In actuality, he only worked 9.58 days per month in FY 2016. He only worked a total of 115 days in 2016 or .49 of a full-time schedule.

206.   Kalispell Regional paid Dr. Wilkinson cash compensation in the amount of $363,781 in FY 2016 ending March 31, 2016.

207.   When his cash compensation is annualized to account for the fact that he worked only 115 days, his full time equivalent cash compensation reaches $738,563.

208.   The national 90th percentile compensation for oncology surgeons was $681,288 according to the most recent 2015 MGMA Physician Compensation and Production Survey Data.

209.   In FY 2016, his compensation to collections ratio was 1.62 as compared to the national 90th percentile of 1.183.  His collections were only $223,661---far below the national 10th percentile of $307,088.

210.   Kalispell Regional excessively compensated Dr. Wilkinson in FY 2015 also. Kalispell Regional paid him cash compensation in the amount of $418,662 despite low collections in the amount of only $191,222 for his personal services. In FY 2015, Dr. Wilkinson produced only 3,411 work RVUs ----- below the national 10th percentile.

211.   Under his contract terms his full-time equivalent compensation was $546,613---just below the national 90th percentile.

212.   The collections for his personal services were $191,222---well below the national 10th percentile for collections of oncology surgeons, $412,535, according to the most recent MGMA data.

213.    His compensation to collections ratio in FY 2015 was 2.19 as compared to the national 90th percentile of 1.45.

214.   A review of his employment contract confirms that he was not required to produce any minimum level of wRVUs or collections for his personal services. The employment contract required him to be "readily available to deliver services to patients...approximately fifteen

calendar days per month." Section 1.1. His base compensation is $360,000 with incentive compensation of $45,000 per year. The criterion for incentive compensation does not include any requirement of personal productivity.

215. Another employed oncology surgeon, Dr. Sydney Lillard, was required to work .78 of full-time equivalent employment. In 2016, she produced only 3,386 wRVUs---below the national 10th percentile that was 3,738. Her services generated collections of only $270,614---below the national 10th percentile for oncology surgeons ($307,088).

216. For her part-time employment and in spite of her low productivity, Kalispell Regional paid her $494,235 in 2016. Her actual full-time equivalent compensation was $649,400---just under the national 90th percentile of $681,288.

217. Her compensation to collections ratio was 1.82---far above the national 90th percentile of 1.183 for oncology surgeons.

218. In 2015, Dr. Lillard generated collections in the amount of $241,420---below the national 10th percentile for oncology surgeons ($309,093). Her wRVUs of 3,389 were also below the national 10th percentile. Nevertheless, Kalispell Regional paid her cash compensation more than double his collections in 2015. Her cash compensation was $558,130. Her compensation to collections ratio was 2.22---far above the national 90th percentile of 1.45 for oncology surgeons.

219. Her employment contract required her to work only 4 days per week with 6 weeks paid time off each year.

220. Her full time equivalent compensation was $713, 344 as compared to the national 90th percentile that was $681,268 in 2015.

221. Among her practice group's patients, approximately 25 percent were covered by the Medicare Program.

40

## Examples of Excessive Payments to Neurosurgeons

222.   Kalispell Regional has also excessively compensated neurosurgeon Dr. Thomas Origitano.

223.   In FY 2014, the collections for his personal services were only $235,302--- far below the national 10th percentile of $448,944.  Yet Kalispell Regional paid him cash compensation in the amount of $927,075 in FY 2014.

224.   The ratio of his compensation to collections was 3.94 as compared to the national 90th percentile of 1.59 as reported in the most recent MGMA Physician Compensation and Production Survey Data.

225.   In FY 2014 his wRVUs were 2,615---far below even the national 10th percentile of 4,086 for neurosurgeons.

226.   In FY 2015, the collections for his personal services were only $207,442--- far below the national 10th percentile of $427,749 for neurosurgeons.  Yet Kalispell Regional paid him cash compensation in the amount of $915,765 in FY 2015 ending March 31, 2015

227.   The ratio of his compensation to collections was 4.4 as compared to the national 90th percentile of 1.6 as reported in the most recent MGMA Physician Compensation and Production Survey Data.

228.   His wRVUs were 3,026, far below even the national 10th percentile of 5,045 according to the most recent MGMA Physician Compensation and Production Survey Data.

229.   His compensation per wRVU in FY 2015 was $302 as compared to the national 90th percentile of $130.

230.   In FY 2016 the collections for his personal services were only $374,124---below the national 10th percentile of $427,749 as reported by the most recent MGMA Physician

41

Compensation and Production Survey Data. Yet Kalispell Regional paid Dr. Origitano cash compensation in the amount of $949,569.

231. The ratio of his compensation to collections was 2.5 as compared to the national 90th percentile of 1.6 as reported in the most recent MGMA Physician Compensation and Production Survey Data.

232. His wRVUs were 3,596, below even the national 10th percentile of 5,045 according to the most recent MGMA Physician Compensation and Production Survey Data.

233. His compensation per wRVU in 2016 was $264 as compared to the national 90th percentile of $130.

234. The collections for his personal services and his wRVUs were below the national 10th percentile, yet Kalispell Regional has paid Dr. Origitano cash compensation of nearly the national 75th percentile. The reason is hospital profits from surgeries referred by Dr. Origitano to Kalispell Regional.

235. Approximately 32 percent of his patients were Medicare patients.

236. A review of his employment contract confirms that he was not required to produce any minimum level of wRVUs or collections for his personal services.

237. Kalispell Regional paid neurosurgeon, Joseph Sramek, cash compensation in the amount of $835,064 in FY 2015 ending March 31, 2015. The collections for his personal services were $476,297--- just above the national 10th percentile of $427,749.

238. The ratio of his compensation to collections was 1.75 as compared to the national 90th percentile of 1.6.

239. His wRVUs were 6,128, just above the national 10th percentile of 5,045 but below the national 25th percentile of 6,850.

240.  His compensation per wRVU in FY 2015 was $136 as compared to the national 90th percentile of $130.

241.  In FY 2016, Kalispell Regional paid Dr. Sramek cash compensation in the amount of $846,033. The collections for his personal services were only $494,358--- below the national 25th percentile of $548,464.

242.  The ratio of his compensation to collections was 1.71 as compared to the national 90th percentile of 1.70.

243.  His wRVUs were 5,371---between the national 10th and 25th percentiles.

244.  His compensation per wRVU in FY 2016 was $157 as compared to the national 90th percentile of $140.

245.  The collections for his personal services and his wRVUs were below the national 25th percentile, yet Kalispell Regional has paid Dr. Sramek cash compensation of nearly the national 75th percentile. The reason is hospital profits from surgeries referred by Dr. Sramek to Kalispell Regional.

246.  Approximately 32 percent of his patients were Medicare patients.

247.  A review of his employment contract confirms that he was not required to produce any minimum level of wRVUs or collections for his personal services.

248.  Due to excessive compensation with low productivity, the neurosurgery and neurology group at Kalispell Regional generated losses of $3.35 million in FY 2014, $3.58 million in FY 2015, and $3.36 million in FY 2016.

## Examples of Excessive Payments to Hospitalists

249.  Hospitalists are also clinical decision-makers with authority to order inpatient admissions, tests, and procedures. Kalispell Regional has also over-compensated hospitalists at levels far in

excess of the 90th percentile levels according to MGMA Physician Compensation and Production Survey Data.

250.  In FY 2016, Kalispell Regional paid $449,945 to Dr. Mark Welch, a hospitalist. That compensation exceeded the national 90th percentile--- $383,495 according to the recent MGMA Physician Compensation and Production Survey data.

251.  Collections for his personal services were only $189,802 --- just above the national 25th percentile.

252.  His wRVUs in 2016 were 3,981 which fell between the national 25th percentile and national median.

253.  The employment contract only required him to work 182 days, which equals 36.4 weeks working 5 days per week. He therefore had the equivalent of nearly 16 weeks off.

254.  His weeks worked fell far below the national 10th percentile (46 weeks according to the MGMA data).

255.  The year before in FY 2015, Kalispell Regional paid $413,547 to Dr. Welch. That compensation also exceeded the national 90th percentile--- $383,495 according to the recent MGMA Physician Compensation and Production Survey data.

256.  Collections for his personal services were only $248,979, just above the national median.

257.  His wRVUs in 2015 were 4,791 which fell between the national median and national 75th percentile.

258.  The employment contract only required him to work 182 days, which equals 36.4 weeks working 5 days per week. He therefore had the equivalent of nearly 16 weeks off. In 2015, his weeks worked fell far below the national 10th percentile according to MGMA data.

259.    One of the reasons for Dr. Welch's excessive compensation is that Kalispell Regional agreed to pay him $56,000 a year for 6 days of "in-hospital administrative work" as Medical Director of the Hospitalist Program. (*See* Paragraph 4 of Exhibit B to the Physician Employment Agreement with Dr. Welch). This compensation equates to $9,333.33 per day for "administrative work." This is one of many examples in which Kalispell Regional used supposed "director" titles to boost physician compensation without requiring actual or demonstrated work to justify such extra compensation.

260.    In FY 2016, Kalispell Regional paid $360,215 to Dr. Charles Woodward, a hospitalist. That compensation approached the national 90th percentile--- $383,495 according to the recent MGMA Physician Compensation and Production Survey data.

261.    Collections for his personal services were $238,141 which was just above the national median.

262.    His wRVUs in FY 2016 were 3,638 which fell between the national 25th percentile and national median.

263.    The employment contract only required him to work 182 days, which equals 36.4 weeks working 5 days per week. In actuality, he only worked 160 days or 32 weeks working 5 days per week in 2016. He had the equivalent of 20 weeks off from work in 2016, yet he was paid at nearly the national 90th percentile.

264.    His weeks worked fell far below the national 10th percentile which was 46 weeks according to the MGMA data.

265.    Due to excessive compensation with low numbers of days worked and low to moderate productivity, the hospitalist practice group at Kalispell Regional generated losses of $1.18 million in 2014, $1.46 million in 2015, and $1.87 million in 2016.

### Examples of Excessive Payments to Radiation Oncologists

266. In FY 2015 ending March 31, 2015, Kalispell Regional paid $646,874 to Dr. Kendra Harris, a radiation oncologist. She started work in July of 2014. Such compensation was for 9 months of work between July 1, 2014 and March 31, 2015.

267. Under her Employment Agreement, she was only required to work 4 days per week on average for 46 weeks per year. The Agreement provides for six weeks of paid time off each year.

268. Her Employment Agreement was signed October 14, 2014, yet took effect three months earlier on July 1, 2014. The *Stark* laws require that compensation must be in writing and set in advance of employment.

269. The Employment Agreement provides a five-year term with based compensation of $550,000 in year one, $600,000 in year two, $650,000 in year three, $700,000 in year four, and $750,000 in year five.

270. The Employment Agreement also provides for "incentive compensation" in the amount of $60,000 each year based on unspecified "performance goals established on an annual basis by agreement between PHYSICIAN, Dr. Stillie, and the Chief Executive Officer." *See* Ex. B to Employment Agreement.

271. In the Employment Agreement, Kalispell Regional also agreed to pay $50,000 each year to be applied to Dr. Harris' student loan obligations.

272. In FY 2015, her full time equivalent compensation was $826,170 as compared to the national 90th percentile of $754,356.

273. Her wRVUs in 2015 were 7,182--- just above the national 25th percentile. She averaged 583 wRVUs per month over the period of April 2014 through July 2015.

274. The Employment Agreement does not provide any requirements for Dr. Harris' personal productivity, wRVUs, or collections for personal services.

275. With low numbers of days worked and low wRVUs at the 25th percentile level, the only financial basis for Kalispell Regional to pay Dr. Harris in excess of the national 90th percentile was revenues from referrals.

276. In FY 2016, Dr. Harris' actual days worked was only .60 of full-time employment. She worked for only 8 months. Yet Kalispell Regional paid her \$584,871. Her annualized compensation was \$877,306 and her full-time equivalent compensation in 2016 was \$977,784----far above the national 90th percentile of \$781,545.

277. Kalispell Regional hired another radiation oncologist, Dr. Gordon Stillie, in November of 2015.

278. The Employment Agreement with Dr. Stillie required him to work only 4 days per week, 44 weeks per year. Each year he receives paid time off for 8 weeks. The term of the Agreement is 3 years

279. The Agreement does not provide any requirements for Dr. Stillie's wRVUs, personal productivity, or collections for his personal services.

280. Under his Employment Agreement effective November 1, 2015, his base compensation is \$540,000. The Agreement also provides for "incentive compensation" in the amount of \$25,000 per contract year for meeting unspecified "mutually agreed upon performance objectives."

281. For FY 2016 ending March 31, 2016, Kalispell Regional paid Dr. Stillie \$540,595. He worked a total of 163 days in FY 2016 or 32.6 weeks of work. Using a five-day week excluding weekends, there are approximately 260 possible work days in the year. Dr. Stillie only worked 163.

282.   His full-time equivalent compensation was $779,384 which exceeded the national 90th percentile of $754,356 according to the most recent MGMA data.

283.   Approximately 37 percent of his patients were covered by the Medicare Program.

284.   Despite his low work days in FY 2016 and despite entering into a new 3–year employment agreement with Dr. Stillie six months earlier, in April of 2016, Kalispell Regional increased Dr. Stillie's based compensation to $600,000.

285.   In April of 2016, Kalispell Regional also rewarded Dr. Stillie with $125,000 in retroactive payments for the time period of December 2015-July 2016.

**Examples of Excessive Compensation to General Surgeons**

286.   Kalispell Regional has also paid excessive salaries to general surgeons. For example, in FY 2016, Dr. Randall Zuckerman worked 7 months. His contract required him to work only .69 of full-time employment. He actually worked .48 of full-time employment. The collections for his services totaled only $61,412. His annualized collections of $105,278 were less than half of the national 10th percentile ($230,413) for general surgeons.

287.   Despite his low collections and part time work schedule over 7 months, Kalispell Regional paid him $318,290 in cash compensation. His compensation to collections ratio was 5.18 as compared to the national 90th percentile of 1.41 for general surgeons.

288.   Kalispell Regional paid general surgeon, John Means, cash compensation in the amount of $539,891 in FY 2015 ending March 31, 2015. The collections for his personal services were $433,376.

289.   Under his employment contract, he was only required to be "available" for work 4 days per week. He did not work full time; his contract required to him to work .78 of a full time schedule. He actually worked less than that.

48

290.   When his cash compensation is annualized to account for the fact that he worked at most 4 days per week, his full time equivalent cash compensation reaches $689,535---above the national 90th percentile compensation for general surgeons ($645,687).

291.   Yet the collections for his personal services were $433,376---just over the national 25th percentile.

292.   His wRVUs of 5,160 in 2015 were also just over the national 25th percentile of 4,951 according to MGMA data.

293.   His compensation per wRVU was $104.63 as compared to the national 90th percentile of $99.15 per wRVU according to MGMA data.

294.   His compensation to collections ratio was 1.24---over the national 90th percentile of 1.22.

295.   A review of his employment contract confirms that he was not required to produce any minimum level of wRVUs or collections for his personal services.

296.   The Employment Agreement with Dr. Means is for a three-year term beginning with effective date of September 1, 2013.  Yet the parties did not sign the Employment Agreement until almost six weeks later on October 11, 2013.

297.   Under the Employment Agreement terms, Dr. Means' compensation is set at $334,000. Yet five months after the Employment Agreement was signed, Kalispell Regional and Dr. Means entered into "Amendment 1" to the Employment Agreement which provided that Dr. Means was "eligible" to receive "incentive compensation" in the amount of $73,200.00 each year. The "incentive compensation" Amendment was signed on March 31, 2014, yet Kalispell Regional agreed to make the "incentive compensation" retroactive to September 1, 2013.

298.   The Amendment provides no performance requirements or criteria for Dr. Means to receive "incentive compensation."

299.   Despite his low personal productivity and low wRVUs each year, Kalispell Regional has paid his maximum bonus each year. The only basis for the bonus is profits from referrals by Dr. Means to Kalispell Regional.

300.   In FY 2015, another general surgeon, Dr. David Fortenberry generated 3514 wRVUs--- less than the national 10th percentile. His contract with Kalispell Regional required him to work only .78 of full time employment.

301.   Despite his low production and part-time schedule, Kalispell Regional paid him $540,764 in FY 2015. Under his employment contract since he only worked part-time, his full time equivalent compensation was $690,649---above the national 90th percentile for general surgeons ($645,687).

302.   His employment contract did not require any minimal level of production or collections. Although he was not paid based on his productivity, in effect, his compensation per wRVU was $153.88---far above the national 90th percentile of $94.70 per wRVU for general surgeons.

## Examples of Excessive Compensation to Orthopedic Surgeons

303.   Between FY 2014 and FY 2016, Kalispell Regional has paid six orthopedic surgeons at levels in excess of national 90th percentile compensation benchmarks.

304.   For all of these physicians, their employment contracts did not require any minimum level of work productivity and did not require any minimum level of collections.   Their work productivity and collections reflected that fact: all of these physicians had low levels of productivity and collections.

305.   In FY 2014 the compensation to collections ratios for 4 orthopedic surgeons---Dr. Blasingame, Dr. Thorderson, Dr. Stimpson, and Dr. Ward---exceeded the national 90th percentile.

50

306.   In FY 2015 the compensation to collections ratios for 4 orthopedic surgeons---Dr. Blasingame, Dr. Thorderson, Dr. Calderon, and Dr. Ward---exceeded the national 90th percentile.

307.   In FY 2016 the compensation to collections ratios for 5 orthopedic surgeons---Dr. Thorderson, Dr. Stimpson, Dr. Magill, Dr. Smith and Dr. Ward---exceeded the national 90th percentile.

308.   For example, in FY 2016, Dr. Thorderson was only required to work .71 of a full-time schedule. His wRVUs were 6,419 and fell between the national 10th and 25th percentiles. His collections of $640,265 fell under the national 10th percentile ($723,754).

309.   Nevertheless, Kalispell Regional paid Dr. Thorderson full time equivalent compensation in excess of the national 90th percentile.

310.   Kalispell Regional paid him $749,075 in FY 2016. His full time equivalent compensation was$1,047,813---over the national 90th percentile compensation of $1,025,751 for orthopedic hand surgeons.

311.   In FY 2016 his compensation to collections ratio was 1.170----over the national 90th percentile of .854 for orthopedic hand surgeons.

312.   In FY 2015, his collections were $558,930---under the national 10th percentile. Kalispell Regional paid him cash in the amount of $716,402. Considering the fact that he was only required to work .71 of a full time schedule, his full time equivalent compensation under his employment contract was $1,002,110---above the national 90th percentile ($970,701).

313.   In FY 2015 his compensation to collections ratio was 1.282---above the national 90th percentile of .970.

314.   In FY 2014, Dr. Thorderson's collections were $522,914---lower than the national 10th percentile of $589,360.

315.   Yet Kalispell Regional paid him $740,984. His full time equivalent compensation was $1,036,495---over the national 90th percentile compensation of $816,999 for orthopedic hand surgeons.

316.   In FY 2014 his compensation to collections ratio was 1.417----over the national 90th percentile of .867 for orthopedic hand surgeons.

### Kalispell Regional Has Repeatedly Violated the *Stark* Law's Requirement that Compensation of Employed Physicians Be Set in Advance

317.   42 C.F.R. § 411.357(d)(v) establishes that a hospital's compensation of employed physicians must comply with the following conditions among others: "The compensation to be paid over the term of each arrangement is set in advance, does not exceed fair market value, and, except in the case of a physician incentive plan (as defined at § 411.351 of this subpart), is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties."

318.   Instead of complying with the simple requirement that compensation be "set in advance," Kalispell Regional has repeatedly rewarded physicians with retroactive increases in compensation based in part on hospital profits from referrals by such physicians.

319.   In September of 2014, Kalispell Regional's orthopedic group, Northwest Orthopedics and Sports Medicine, entered into Amendment 3 of the Physician Employment Agreement with Dr. Thorderson. In this Amendment, Kalispell Regional increased Dr. Thorderson's annual base compensation from $560,000 to $601,952. Despite the fact that Amendment 3 was signed on September 16, 2014 by Kalispell Regional's CEO, the Amendment states, "The effective date of this AMENDMENT shall be deemed January 1, 2012." Kalispell Regional gave Dr. Thorderson a major retroactive increase in compensation.

320. Kalispell Regional committed similar violations of *Stark laws* with respect to retroactive compensation given to another orthopedic surgeon, Dr. Kim Stimpson. In April of 2015, the Kalispell Regional CEO signed Amendment 3 to his Employment Agreement. This Amendment increased his base compensation to $601,952. Despite being signed by the CEO and Dr. Stimpson in April of 2015, Amendment 3 states, "The effective date of this Amendment shall be deemed retroactive to January 1, 2012."

321. In November of 2015, Kalispell Regional's CEO and Dr. Craig Harrison signed Amendment 2 to his Employment Agreement. This Amendment increased Dr. Harrison's base compensation to $520,000 yet reduced his time working from 4 days per week to only 3 days per week, 46 weeks per year. In this Amendment, Kalispell Regional agreed to pay him $2,000 for "each half day in excess of three (3) clinic days per week." Kalispell Regional also agreed to delete the paragraph of his original Employment Agreement that provided for "productivity incentive compensation." Under the changes in Amendment 2, Dr. Harrison would work fewer days, make more money, and have no requirements or incentives for productivity.

322. Kalispell Regional's CEO signed the Amendment 2 on November 10, 2015, yet agreed to the following: "The effective date of this Amendment shall be deemed retroactive to September 6, 2015."

323. In the prior year, Kalispell Regional agreed to another retroactive increase in compensation to Dr. Craig Harrison. In Amendment 1 signed in July 2014, Kalispell Regional agreed to pay Dr. Harrison compensation for "lead physician" services and agreed that the "[t]he effective date of this AGREEMENT shall be deemed June 1, 2013."

324. In October of 2015, Kalispell Regional gave Dr. Origitana a retroactive increase in his bonus. His original employment agreement provided that he was eligible to receive a bonus in the

gross amount of $50,000 per year. In October of 2015, the Kalispell Regional CEO agreed to change his contract so that he would receive a bonus in the "net amount" of $50,000 after taxes. In October of 2015, the Kalispell Regional CEO and Dr. Origitano signed Amendment 3 to his Employment Agreement that stated, "The effective date of this Amendment shall be deemed retroactive to October 1, 2014." Mr. Mohatt sent an email to the Chief Financial Officer and Chief Physician Executive in which he objected to this bonus increase to Dr. Origitano because his compensation to collections ratio and his compensation per wRVU were "both over three times the 75th %tile marks.".

325.  In February of 2014, Kalispell Regional gave Dr. Blasingame a retroactive increase in compensation. In Amendment 2 to his Employment Agreement signed in February of 2014, Kalispell Regional agreed to pay additional amounts to Dr. Blasingame for call coverage and agreed to pay him "incentive performance bonus compensation." "The effective date of this Amendment shall be January 1, 2013."

326.  In September of 2014, Kalispell Regional increased Dr. Blasingame's base salary to $601,952. Under this Amendment 3 to his Employment Agreement, "the effective date of this AMENDMENT shall be deemed January 1, 2012."

327.  In February 2016, Kalispell Regional increased his compensation again with retroactive effect. In February Kalispell Regional added "consulting fee compensation" for Dr. Blasingame, agreeing to pay him an additional $201,952 per year "for assisting the Chief Physician Executive with administrative duties." "The effective date of this Amendment shall be December 5, 2015."

328.  For Dr. Calderon, in September of 2014, Kalispell Regional entered into Amendment 1 to the Employment Agreement and agreed to pay him retroactive "call coverage compensation." "The effective date of this AMENDMENT shall be deemed January 4, 2013."

329.    In August 2016, Kalispell Regional agreed to amend Dr. Costrini's Employment Agreement to pay him retroactive "administrative services incentive compensation" in the amount of $100,000 per contract year. "The effective date of this Amendment is June 1, 2015."

330.    In December of 2014, Kalispell Regional agreed to pay Dr. Craig retroactive back-up trauma call pay compensation. "The effective date of this Amendment shall be deemed June 1, 2014."

331.    In January of 2015, Kalispell Regional again agreed to pay Dr. Craig retroactive call pay compensation. "The effective date of this Amendment shall be deemed June 1, 2014."

332.    In December of 2014, Kalispell Regional also agreed to pay Dr. Dykstra retroactive back-up trauma call pay compensation. "The effective date of this Amendment shall be deemed June 1, 2014."

333.    In June of 2014, Kalispell Regional again agreed to pay Dr. Dykstra retroactive call pay compensation. "The effective date of this Amendment shall be deemed April 1, 2013."

334.    In December of 2014, Kalispell Regional also agreed to pay Dr. Fortenberry retroactive back-up trauma call pay compensation. "The effective date of this Amendment shall be deemed June 1, 2014."

335.    In June of 2014, Kalispell Regional again agreed to pay Dr. Gavagan retroactive call pay compensation. "The effective date of this Amendment shall be deemed April 1, 2013."

336.    In September of 2015, Kalispell Regional amended the Employment Agreement with Dr. Goldberg and agreed to pay him an "additional sign-on bonus" in the amount of $25,000. "The effective date of this Amendment shall be deemed retroactive to July 1, 2015."

337.    In October of 2014, Kalispell Regional and Dr. Kendra Harris entered into an Employment Agreement. The Agreement states, 'The PARTIES intend this Agreement to take effect on July 1,

2014." The compensation terms of the Employment Agreement with Dr. Harris were given retroactive effect.

338.    In May of 2014, Kalispell Regional entered into an Employment Agreement with Dr. Craig Harrison. Section 6.17 of the Agreement states, "The PARTIES intend this AGREEMENT to take effect on June 1, 2013."

339.    In July 2014, Kalispell Regional amended the Agreement with Dr. Harrison to give him more money for "lead physician compensation." Again, Kalispell Regional made the increased payment retroactive: "The effective date of this AGREEMENT shall be deemed June 1, 2013."

340.    In November of 2015, Kalispell Regional gave Dr. Harrison another retroactive increase in compensation. They increased his base compensation to $520,000 and only required him to work 3 days per week for 46 weeks per year. For each half day of work in excess of 3 days per week, Kalispell Regional agreed to pay him an additional $2,000. "The effective date of this Amendment shall be deemed retroactive to September 6, 2015." (Amendment #2, Paragraph 6).

341.    Kalispell Regional has also given retroactive increased compensation to Dr. Robin Harrison. In June of 2014, Kalispell Regional increased the call compensation to Dr. Robin Harrison. "The effective date of this Amendment shall be deemed April 1, 2013." Amendment #2, Paragraph 2.

342.    In December of 2014, Kalispell Regional increased the trauma call compensation to Dr. Robin Harrison. "The effective date of this Amendment shall be deemed June 1, 2014." Amendment #2, Paragraph 2.

343.    Kalispell Regional has also given retroactive increased compensation to Dr. Drew Kirshner. In March of 2016, Kalispell Regional increased the call compensation to Dr. Kirshner. "The effective date of this Amendment shall be July 1, 2015." Amendment #2, Paragraph 2.

344. In April of 2015, Kalispell Regional gave additional call compensation to Dr. Klawiter. "The effective date of this AMENDMENT shall be deemed January 1, 2015."

345. In July of 2014, Kalispell Regional gave additional call compensation to Dr. Lillard. "The effective date of this AGREEMENT shall be deemed January 1, 2014."

346. In March of 2014, Kalispell Regional amended the Employment Agreement with Dr. Means to give him "incentive compensation" each fiscal year in the amount of $73,200. "The effective date of this Amendment shall be September 1, 2013.

347. In June of 2014, Kalispell Regional gave additional call compensation to Dr. Milheim. "The effective date of this AGREEMENT shall be deemed April 1, 2013."

348. In April of 2014, Kalispell Regional entered into Amendment #1 to the Employment Agreement with Dr. Sheldon to give him additional "incentive compensation" and additional call pay. "The effective date of this amendment is December 31, 2013."

349. In February of 2014, Kalispell Regional and Dr. Stimpson entered into Amendment #2 to the Employment Agreement. Kalispell Regional agreed to pay Dr. Stimpson additional call coverage compensation. This increase in compensation was also retroactive: "The effective date of this Amendment shall be January 1, 2013.

350. In April of 2015, Kalispell Regional entered into Amendment #3 to the Employment Agreement with Dr. Stimpson. In this Amendment, Kalispell Regional agreed to increase Dr. Stimpson's base salary to $601,952. "The effective date of this Amendment shall be deemed retroactive to January 1, 2012." Amendment #3, Par. 2.

351. In February of 2014, Kalispell Regional agreed to increase Dr. Thorderson's call coverage compensation retroactive to January 1, 2013. Amendent #2 to Dr. Thorderson's Employment Agreement states, "The effective date of this Amendment shall be January 1, 2013."

352.   In September of 2014, Kalispell Regional agreed to increase Dr. Thorderson's base salary to $601,952. The parties entered into Amendment #3 to Dr. Thorderson's Employment Agreement. "The effective date of this AMENDMENT shall be deemed January 1, 2012." Kalispell Regional gave Dr. Thorderson increased compensation retroactive to 33 months earlier.

353.   In May of 2014, Kalispell Regional entered into the Employment Agreement with Dr. Tice. Yet the Agreement and its compensation terms are retroactive to June 1, 2013. Section 6.17 of the Agreement states, "The PARTIES intend this AGREEMENT to take effect on June 1, 2013."

354.   In November of 2013, Kalispell Regional and Dr. Wheeler agreed to Amendment #1 to the Employment Agreement. In this Amendment, Kalispell Regional agreed to increase Dr. Wheeler's sign-on bonus from $25,000 to $37,500. "The effective date of this Amendment shall be March 14, 2013."

355.   In April of 2015, Kalispell Regional and Dr. Wheeler entered into Amendment #2 to the Employment Agreement. This Amendment increased Dr. Wheeler's call compensation. "The effective date of this AMENDMENT shall be deemed January 1, 2015." Amendment #2, Paragraph 2.

356.   In July of 2013, Kalispell Regional and Dr. Yacavone entered into Amendment #1 to the Employment Agreement. In this Amendment, Kalispell Regional agreed to pay $20,000 annually to Dr. Yacavone "for his services as Director of the Gastroenterology Center of Excellence." "The effective dates of this Amendment shall be May 15, 2011."

357.   With respect to each of the retroactive compensation increases given to employed physicians, these physicians were already working under employment contracts with agreed compensation terms. Kalispell Regional was well within its contractual rights to continue those

contract terms. Instead, Kalispell Regional rewarded physicians with compensation increases based on the hospital system's profits from referrals by such physicians.

### Relator Has Repeatedly Objected to Physician Compensation at Kalispell Regional

358.   Mohatt has repeatedly raised concerns to Stephens and the executive leadership at Kalispell Regional about the significant losses caused by excessive physician compensation. Stephens has repeatedly insisted that the losses are part of the hospital's business strategy because "we make up [the losses] in the hospital" through revenues from referrals by these physicians.

359.   Stephens has shunned Mohatt for trying to discuss how the physician compensation levels were not commercially reasonable. When Mohatt tried to share information with certain physicians or raised concerns about excessive compensation, Stephens told him that he needed to "be careful about what you say."

360.   On June 17-18, 2014, Mohatt attended a SullivanCotter physician compensation training seminar in Denver, Colorado. The Kalispell Regional Human Resources (HR) Director and Chief Operating Officer also attended the seminar. Mohatt came back and made multiple suggestions for compliance with *Stark* laws, but his suggestions have been ignored.

361.   In July of 2014, Mohatt advised the executive leadership that Kalispell Regional needed a common physician compensation philosophy ratified by the Board and that any excessive salaries had to be approved by the Board. The Board would later adopt a new compensation policy but it has not been followed or implemented with physician contracts.  To date Kalispell Regional has not reviewed a single physician employment contract for compliance with the new compensation policy.  The policy is a token gesture for appearance, not actual compliance.

362.   In August of 2015, Mohatt developed and distributed an electronic tool to help guide compensation within commercially reasonable parameters but Mohatt's efforts have been ignored.

He used the tool to demonstrate that Dr. Cole's compensation was excessive. In an email to Jack Bell and others who made compensation recommendations to the CEO, Mohatt wrote, "I would favor moving to a compensation model that aligned comp with production." *Id.*

363. On October 15, 2015, Mohatt sent an email to executive leadership in which he objected to giving Dr. Origitano, a neurosurgeon, an increase in his bonus. Stephens had directed an amendment to Dr. Origitano's bonus so that he would net $50,000 in bonus money. Mohatt objected to the increased bonus because his compensation to collections ratio and his compensation per wRVU were "both over three times the 75th %tile marks."

364. In November of 2015, Mohatt sent an email objecting to payments to physicians for "director" services without any confirmation or documentation of services performed. For example, Dr. Costrini was paid an extra $150,000 per year for "director" services with no documentation of hours worked or services performed. Dr. Welch was paid an extra $56,000 per year for "director" services with no confirmation or documentation of services performed. Dr. Origitano was paid an extra $75,000 per year for "director" services with no documentation of hours worked or services performed. Dr. Lillard was paid an extra $74,000 per year with two "director" titles with no documentation of hours worked or services performed. Dr. Taylor was paid an extra $50,000 per year for "director" services with no documentation of hours worked or services performed.

365. On November 25, 2015, Mohatt sent an email to Dr. Rankin (and copied Gary Chalfant and Charles Pearce) with a sheet tracking the physicians who had submitted the required time sheets for payment. There were a total of 47 physicians receiving payments for "director" services. Mohatt determined that only 3 of these physicians had submitted documentation supporting fair market compensation for their director payments. In his email on November 25, 2015, Mohatt

wrote, "We only have three within FMV parameters. Most are simply not compliant…Definitely something we should address with our physician partners that are Directors."

366.   Despite Mohatt's expressed concerns and objections, in the past three years, the bonuses and base pay of specialists continue to grow even though their practices continue to lose substantial money. In FY 2016 (April 2015-March 2016) the physician practices lost in excess of $22.8 million. Stephens has continued to direct the physician compensation increases based on contribution margin reports tracking the value and volume of referrals from these physicians.

**Kalispell Regional Has Violated Federal *Stark* Laws**

367.   Under a scheme of mutual enrichment, Kalispell Regional has paid certain employed physicians far in excess of the value of their personal services while Kalispell Regional received substantial profits from inpatient and outpatient referrals by these physicians.

368.   Kalispell Regional has compensated certain employed physicians (1) at levels which far exceeded the fair market value of their personal services, (2) at levels which were not commercially reasonable if the physicians were not in a position to generate referral business for Kalispell Regional, and (3) at levels which were determined and paid based on the volume and value of inpatient and outpatient referrals by such physicians to Kalispell Regional hospitals and clinics.

369.   Kalispell Regional has knowingly violated Federal *Stark* and Anti-Kickback laws discussed below and has knowingly submitted thousands of false claims to Federal Health Care Programs[4] which claims arose through tainted referrals from employed physicians receiving excessive payments from Kalispell Regional.

---

[4]Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and Tri-Care Programs in addition to federal employees and retired federal employees.

370. The Federal *Stark* Law "was enacted to address over-utilization, anti-competitive behavior, and other abuses of health care services that occur when physicians have financial relationships with certain ancillary service entities to which they refer Medicare or Medicaid patients." 69 Federal Register 16124 (March 26, 2004).

371. "The approach taken by the Congress in enacting section 1877 of the Act is preventive because it essentially prohibits many financial arrangements between physicians and entities providing DHS." 66 Federal Register 859. "Specifically, Section 1877 of the Act imposes a blanket prohibition on the submission of Medicare claims (and payment to the States of FFP under the Medicaid program) for certain DHS when the service provider has a financial relationship with the referring physician, unless the financial relationship fits into one of several relatively specific exceptions." *Id.*

372. Congress enacted the *Stark* Statute in two parts, commonly known as *Stark I* and *Stark II.* Enacted in 1989, *Stark I* applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

373. In 1993, Congress extended the *Stark* Statute (*Stark II*) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152. As of January 1, 1995, *Stark II* applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics orthotics, and prosthetic devices and supplies; (9) outpatient prescription

drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

374.   The *Stark* Law broadly defines prohibited "financial relationships" to include

"compensation arrangements" in which any "remuneration" is paid by a hospital to a referring

physician "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn

(a)(2)(B), (h)(1); 42 C.F.R. § 411.354(c).

375.   The *Stark* Law broadly defines a prohibited "compensation arrangement":

> (A) The term "compensation arrangement" means any arrangement
> involving any remuneration between a physician (or an immediate
> family member of such physician) and any entity other than an
> arrangement involving only remuneration described in subparagraph
> (C).
> (B) The term "remuneration" includes any remuneration, directly or
> indirectly, overtly or covertly, in cash or in kind.

42 U.S.C. § 1395nn(h)(1).

376.   This language makes clear that Congress intended the definition of "financial relationship"

to include any type of financial relationship in which physicians receive any remuneration or any

kind from a hospital, directly or indirectly, overtly or covertly.

377.   The *Stark* Law provides that if a physician has a financial relationship with a hospital or

entity, then:

> (A) The physician may not make a referral to the entity for the
> furnishing of designated health services for which    payment
> otherwise may be made under this subchapter, and
> (B) the entity may not present or cause to be presented a claim
> under this subchapter or bill to any individual, third party
> payor, or other entity for designated health services furnished
> pursuant to a referral prohibited under sub paragraph (A).

42 U.S.C. § 1395nn (a)(1).

378.   In addition to prohibiting the hospital from submitting claims under these circumstances,

the *Stark* Law also prohibits payments by Federal Healthcare Programs of such claims: "No

payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1).[5] If a hospital submits prohibited claims and collects payment, the regulations implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

## The *Stark* Statute's Broad Definition of "Referral"

379.     The *Stark* Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn (h) (5) (A).

380.     The accompanying regulations applying the *Stark* Statute also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

381.     As discussed above, the *Stark* Statute broadly defines prohibited "financial relationships"

---

[5] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services...radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

to include any "compensation" paid directly or indirectly to a referring physician. The *Stark* Statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. To avoid the referral and billing prohibitions in the *Stark* Statute, a hospital's financial relationship with a physician must satisfy one of the exceptions.

382.   Once the plaintiff or the government has established proof of each element of a violation under the Act, the burden shifts to the defendant to establish that the conduct was protected by an exception. If no exception applies to a *Stark* violation, then all referrals from the referring employed physician to the DHS entity are subject to prohibition.

### A Bona Fide Employment Relationship Must Satisfy Four Primary Requirements

383.   A hospital employing and paying a physician who makes referrals to that hospital of Medicare and Medicaid patients must satisfy the statutory exception for "bona fide employment relationships." Under the *Stark* Statute, a "bona fide employment relationship" must satisfy the following four relevant requirements: (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment...is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

### Physician Compensation Must be "Consistent with the Fair Market Value of the Services" Personally Performed by the Physician

384.   In pertinent part, the statutory language focuses on "the fair market value of the services" personally performed by the physician.   42 U.S.C.S. § 1395nn (e)(2).

385. "[S]ection 1877 of the Act contemplates that physicians---whether group practice members, independent contractors or employees---**can be paid in a manner that directly correlates to their own personal labor...**" 66 Federal Register 876 (emphasis added). "In the case of...employees under the *bona fide* employment exception, the amount of compensation for personal productivity is limited to fair market value for the services they personally perform." *Id.* **"In other words, 'productivity,' as used in the statute, refers to the quantity and intensity of a physician's own work, but does not include the physician's fruitfulness in generating DHS performed by others..."** *Id.* (emphasis added).   "The fair market value standard in these exceptions acts as an additional check against inappropriate financial incentives." *Id.*

386. The *Stark* Statute provides that "[t]he term 'fair market value' means the value in arm's length transactions, consistent with the general market value . . ." 42 U.S.C. § 1395nn(h)(3). Federal regulations amplify this definition as follows:

> Fair market value means the value in arm's-length transactions, consistent with the general market value. "General market value" means the price that an asset would bring as the result of bona fide bargaining between well-informed buyers and sellers *who are not otherwise in a position to generate business for the other party*, or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement *who are not otherwise in a position to generate business for the other party*, on the date of acquisition of the asset or at the time of the service agreement." 42 C.F.R. § 411.351 (emphasis added).

387. The *Stark* Statute "establishes a straightforward test that compensation arrangements should be at fair market value for the work or service performed....not inflated to compensate for the physician's ability to generate other revenues." 66 Fed. Reg. at 877 (emphasis added).

**Physician Compensation Must Not be "Determined in a Manner that Takes into Account (Directly or Indirectly) the Volume or Value of any Referrals by the Referring Physician"**

388.    The *Stark* Law also requires that "the amount of the remuneration under the employment...is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. § 1395nn (e)(2).

389.    If physicians are paid "per service" or "per time period," the "per service" amount "must reflect fair market value at inception not taking into account the volume or value of referrals and must not change over the term of the contract based on the volume or value of DHS referrals..." 66 Federal Register 878.  Compensation based on a unit of service or time must be "fair market value for services or items actually provided" and personally performed by an employed physician. 69 Federal Register 16069.

390.    Apparent fixed payments to physicians may also violate Federal *Stark* laws. "If the payments reflect or take into account non-personally performed services, they may raise concerns under the statute and would merit case-by-case determination, regardless of the apparent fixed determination." 69 Federal Register 16088.

391.    The *Stark* Statute prohibits a hospital from determining compensation "in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. § 1395nn (e)(2). Kalispell Regional has repeatedly and deliberately violated this Federal law.

**The *Stark* Statute Requires that Physician Compensation Must be "Commercially Reasonable Even if No Referrals Were Made to the Employer"**

392.    The *Stark* Statute also requires that the remuneration to an employed physician must be "provided pursuant to an agreement which would be commercially reasonable even if no referrals

67

were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

393.   "An arrangement will be considered 'commercially reasonable' in the absence of referrals if the arrangement would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician (or family member or group practice) of similar scope and specialty, even if there were no potential DHS referrals." 69 Federal Register 16093.

394.   A negotiated agreement between interested parties does not by definition reflect fair market value. The *Stark* Laws are predicated on the recognition that, when one party is in a position to generate business for the other, negotiated agreements between such parties are often designed to disguise the payment of compensation in excess of fair market value.

## The Anti-Kickback Statute Also Mandates that a Hospital's Payments to an Employed Physician Must be Consistent with the Fair Market Value of the Physician's Services and Must Not Take Into Account the Volume or Value of Referrals to the Hospital

395.   The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from offering, making or accepting payment to induce or reward any person for referring, recommending or arranging for federally funded medical services, including services provided under the Medicare, Medicaid, and TRICARE programs.

396.   The Anti-Kickback Statute prohibits a hospital from offering or paying "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

397.   The United States Department of Health and Human Services ("HHS") has promulgated regulations specifying those payment practices that will not be subject to criminal prosecution or

provide a basis for administrative exclusion. The "Safe Harbor" regulations, 42 C.F.R. § 1001.952, list various circumstances under which a financial relationship between a provider and a referral source would not trigger liability under the Anti-Kickback Statute.

398.    Payments to a physician under a personal service agreement must be "set in advance, [must be]… consistent with fair market value in arms-length transactions and [must]…not [be] determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program." 42 C.F.R. § 1001.952(d) (2000).

399.    The Federal Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, too costly, poor quality, or even harmful to a vulnerable patient population. The Anti-Kickback Statute was partially based on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there is a financial incentive to generate business.

400.    To protect the integrity of Federal Healthcare Programs, and realizing the difficulty for regulators and law enforcement to review every case for medically unnecessary procedures, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the kickback gave rise to overutilization or poor quality of care.

401.    "If any one purpose of remuneration is to induce or reward referrals of Federal health care program business, the [Anti-kickback] statute is violated." 66 Federal Register 919.

402.    First enacted in 1972, Congress strengthened the Anti-Kickback Statute in 1977 and 1978 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, 242(b) and 9c); 42 U.S.C. § 1320a-7b,

Medicare Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

403.   The *Stark* Laws and the Anti-Kickback Statute are "complementary and although overlapping in some aspects, not redundant." 66 Federal Register 863.  "We believe the Congress intended to create an array of fraud and abuse authorities to enable the government to protect the public fisc, beneficiaries of Federal programs, and honest health care providers from the corruption of the health care system by unscrupulous providers." *Id.*   "Congress only intended [the *Stark* laws] to establish a minimum threshold for acceptable financial relationships, and that potentially abusive financial relationships that may be permitted under Section 1877 of the Act could still be addressed through other statutes that address health care fraud and abuse, including the anti-kickback statute (Section 1128B(b) of the Act)." 66 Federal Register 860.

404.    Violation of the Anti-Kickback Statute may subject the perpetrator to exclusion from participation in Federal Healthcare Programs, civil monetary penalties of $50,000 per violation, and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. § 1320-7(b) (7) and 42 U.S.C. § 1320a-7a (a) (7).

## Federal Healthcare Programs

## Introduction to the Medicare Program

405.   Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and Tri-Care Programs discussed below in addition to federal employees and retired federal employees.

406.   Since 2011, Kalispell Regional has received over 600 million dollars from the Medicare

Program. Payments from the Medicare Program account for approximately 32-34 percent of Kalispell Regional's revenues each year. Payments from the Medicaid Program account for another 5-6 percent of Kalispell Regional's revenues each year.

407.   A significant portion of such payments from the Medicare Program derived from inpatient and outpatient referrals by employed physicians receiving excessive payments from Kalispell Regional as described above.

408.   Between FY 2011 and the present, Kalispell Regional has submitted thousands of claims both for specific services provided to Medicare beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

409.   The Medicare Program covers the costs of certain medical services for persons aged 65 years or older and those with disabilities.

410.   The Medicare Program is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled, nursing facility, and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare Program authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

411.   HHS is responsible for the administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

412.   Under the Medicare Program, CMS makes payments retrospectively to hospitals for inpatient services. Medicare enters into provider agreements with hospitals to establish the hospitals' eligibility to participate in the Medicare Program. Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

413.    Kalispell Regional has executed at least one provider agreement with CMS in which it agreed to abide by the Medicare laws, regulations and program instructions..." CMS Provider/Supplier Enrollment Application, Forms 855-A and 855-B.

414.    In the provider agreement, Kalispell Regional certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulation and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)..." *Id.*

415.    To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

416.    Hospitals submit claims for interim reimbursement for items and services delivered to Medicare beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-04.

417.    As a condition of payment by Medicare, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries. As discussed above and below, each cost report contains mandatory certifications of compliance with *Stark* and Anti-Kickback Laws.

418.    After the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 13959g); 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§

405.1803, 413.60 and 413.64(f) (1).

419.   Kalispell Regional was required to submit cost reports to their fiscal intermediary for each Fiscal Year between 2011 and the present.

420.   Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically UB-04 Forms) during the course of the fiscal year. On the cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider are subtracted to determine the amount due Medicare or the amount due the provider.

421.   At all times relevant to this Complaint, the Medicare Program, through its fiscal intermediaries, had the right to audit the cost reports and financial representations made by Kalispell Regional to ensure their accuracy and protect the integrity of the Medicare Program. This includes the right to adjust cost reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

422.   Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

423.   For each of the Fiscal Years between 2011 and the present, each cost report certification page submitted by Kalispell Regional included the following notice: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. **Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines**

**and/or imprisonment may result**." (Emphasis added).

424.   On each cost report for each Fiscal Year from 2011 through the present, the responsible officer of Kalispell Regional was required to certify, in pertinent part, as follows: "I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report….and that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.**" (Emphasis added).

425.   Kalispell Regional was required to certify that their filed cost reports were  (1) truthful, i.e., that the cost information contained in the report is true and accurate, (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, (3) complete, i.e., that the cost report is based upon all knowledge known to the provider, (4) **that the services provided in the cost report were not linked to kickbacks, and (5) that the provider complied with laws and regulations regarding the provision of health care services, such as the _Stark_ and Anti-Kickback Statutes.**

426.   Kalispell Regional was also required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b (a) (3) specifically confirms the duty to disclose known errors in cost reports. "Whoever….having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment…conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is

due or when no such benefit or payment is authorized…shall in the case of such a ….concealment or failure…be guilty of a felony."

427.    In the months following the end of each fiscal year, Kalispell Regional submitted annual cost reports to the Centers for Medicare and Medicaid Services (CMS) and attested to the certifications stated above. Kalispell Regional submitted cost reports with the certifications stated above for Fiscal Years 2011, 2012, 2013, 2014, and 2015.

428.    CMS issued a Notice of Provider Reimbursement (NPR) based on the financial data submitted in the cost reports by Kalispell Regional for each Fiscal Year.

429.    In accordance with 42 C.F.R. § 415.1885, a cost report may be reopened within three (3) years of the Notice of Program Reimbursement date. The Federal regulations establish that the cost report may be reopened due to false claims or if the provider has provided inaccurate cost report data.

430.    After the submission of their cost reports each year to CMS, Kalispell Regional had ongoing duties and opportunities to request the reopening of their previous cost reports which contained false information submitted to Federal healthcare programs.

431.    In addition to the in-patient fees billed by hospitals, physicians also separately bill for their services provided to Medicare patients under Part B. Physicians and physician groups submit Form CMS-1500 for this purpose.

432.    Form CMS-1500 requires the physician to certify that he or she "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

433.    By submitting CMS-1500 forms, physicians and physician groups certify that they are

eligible for participation in the Medicare Program, and that they have complied with all applicable regulations and laws governing the Program, such as the *Stark* and Anti-Kickback Laws.

## **Introduction to Medicaid Program**

434.   The Medicaid Program is a joint federal-state program that provides health care benefits primarily for the poor and disabled. Medicaid is authorized under Title XIX of the Social Security Act and is administered by each State in compliance with Federal requirements specified in the Medicaid statute and regulations. "The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve." 66 Federal Register 857.

435.   The Federal Medicaid statute sets forth minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§1396, *et seq*.  As part of such minimum requirements, each state's Medicaid program must cover hospital and physician services. 42 U.S.C. § 1396a (10)(A), 42 U.S.C. § 1396d (a)(1)-(2), (5).

436.   The Federal matching rate for the Montana Medicaid Program is approximately 68 percent. *www.statefhealthfacts.org.*

437.   "Section 13624 of OBRA 1993, entitled 'Application of Medicare Rules Limiting Certain Physician Referrals,' added a new paragraph (s) to section 1903 of the Act, that extends aspects of the Medicare prohibition on physician referrals to Medicaid." 66 Federal Register 857. "This provision bars FFP in State expenditures for DHS furnished to an individual based on a physician referral that would result in denial of payment for the services under the Medicare program if Medicare covered the services to the same extent and under the same terms and conditions as under the State Medicaid plan." 66 Federal Register 858.

438. "The statute also made certain reporting requirements in section 1877(f) of the Act and a civil monetary penalty provision in section 1877(g)(5) (related to reporting requirements) applicable to providers of DHS for which payment may be made under Medicaid in the same manner as they apply to providers of such services for which payment may be made under Medicare." 66 Federal Register 858.

439. In Montana, provider hospitals participating in the Medicaid Program file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports. Medicaid providers must incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports.

440. Within such Medicaid cost reports, hospitals must certify the accuracy of the information provided and certify compliance with Medicaid laws and regulations, including compliance with the *Stark* and Anti-kickback laws.

441. The Montana Medicaid Program uses the Medicaid patient data in the cost reports to determine the payments due each facility.

442. Defendants submitted claims to Medicaid that were based in part on their Medicaid cost reports and their false certifications of compliance with Federal *Stark* and Anti-Kickback Laws. The Montana Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims submitted by Kalispell Regional.

## Introduction to TRICARE

443. Kalispell Regional was also enrolled in and sought payments from the Civilian Health and Medical Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

444. TRICARE is a federally-funded program that provides medical benefits, including hospital

services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well. 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a).  Kalispell Regional has received revenue from the TRICARE Program.

445.   In addition to individual patient costs, TRICARE pays hospitals for two types of costs, both based on the Medicare cost report: capital costs and direct medical education costs. 32 C.F.R. § 199.6.

446.   A provider seeking reimbursement from TRICARE for these costs is required to submit a TRICARE form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement"), in which the provider sets forth the number of patient days and financial information related to these costs. These costs are derived from the provider's Medicare cost report.

447.   The Request for Reimbursement requires that the provider certify that the information contained therein is "is accurate and based upon the hospital's Medicare cost report."

448.   Upon receipt of a provider's Request for Reimbursement, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the provider receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the hospital.

449.   Kalispell Regional submitted Requests for Reimbursement to TRICARE that were based on their Medicare cost reports. Whenever the Medicare cost reports of Kalispell Regional contained false information or false certifications from which they derived their Requests for Reimbursement submitted to TRICARE, those Requests for Reimbursement were also false.

450.   On each occasion when Kalispell Regional's Requests for Reimbursement were false due

to falsity in its Medicare cost reports, Kalispell Regional falsely certified that the information contained in its Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

451.   Kalispell Regional knew that false claims contained in their Medicare cost reports would affect TRICARE/CHAMPUS payments as well and result in damages to the federal government.[6]

### Introduction to the False Claims Act

452.   The False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material[7] to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation[8] to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

453.   The False Claims Act defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the

---

[6] Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and TRICARE Programs in addition to federal employees and retired federal employees.

[7] "The term 'material' means having a natural tendency to influence. Or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

[8] The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

money or property, that…is presented to an officer, employee or agent of the United States…or is made to a contractor, grantee or other recipient, if the money or property is to be spent on the Government's behalf or to advance a Government program, and if the United States Government…provides or has provided any portion of the money or property requested or demanded…or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

454.    Statutory liability under the False Claims Act includes a civil penalty "not less than $5,500 and not more than $11,000" per false claim "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).

455.    Under the Federal False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and require no proof of specific intent to defraud." 31 U.S.C. 3729 (b)(1).

456.    In considering the requisite scienter which subjects a defendant to liability under the False Claims Act, "no proof of specific intent to defraud" is required. *Id.* Under the False Claims Act, a defendant is liable for acting in "reckless disregard of the truth or falsity of the information" or acting in "deliberate ignorance of the truth or falsity of the information." *Id.*

457.    Protection of the public treasury requires that those who seek public funds act with scrupulous regard for the requirements of law. Participants in Federal Healthcare Programs have a duty to familiarize themselves with the legal requirements for payment and ensure compliance. A defendant who fails to inform himself of those requirements acts in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question. Likewise, a defendant who fails to verify and evaluate the

accuracy of information or investigate the accuracy of information when on notice of questions concerning the accuracy of such information acts in reckless disregard or deliberate ignorance sufficient to charge him with knowledge of the falsity of the claims in question.

### Certifying Compliance with the Federal *Stark* Laws and Anti-Kickback Statutes Is Condition of Payment Under Federal Healthcare Programs and False Certifications are Actionable under the False Claims Act

458.    Federal law establishes that falsely certifying compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (b), and *Stark* Statute, 42 U.S.C. § 1395nn, in a Medicare cost report is actionable under the False Claims Act. False claims to Medicare, including Medicare cost reports and UB-04 forms[9] are actionable under the False Claims Act. The submission of UB-04 forms in violation of the *Stark* Statute constitutes a violation of the False Claims Act.

459.    The *Stark* Laws state that compliance is a mandatory condition of Medicare payments. Likewise, compliance with the Anti-Kickback Statute is a mandatory condition of payment by the Medicaid Program. 42 U.S.C. § 1320a-7b (b).

460.    On their annual cost reports submitted to CMS for each of the fiscal years in question, Kalispell Regional has certified that none of the services billed Federal health care programs were "provided or procured through the payment directly or indirectly of a kickback." Each cost report states, "**If services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.**" (Emphasis added).

461.    For each year from 2011 through the present, the annual cost report was signed by a Kalispell Regional officer or administrator who certified "**that I am familiar with the laws and**

---

[9] The UB-04 form is a claim form for hospitals to submit claims for payment to the Medicare Program.

**regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations."** (Emphasis added). The certifications were a prerequisite to payment under Federal Healthcare Programs. Kalispell Regional's express certifications were and continue to be knowingly false for the reasons stated in this Complaint.

462.   Kalispell Regional has also violated the Federal False Claims Act through other certifications of compliance with the Anti-Kickback Laws and *Stark* Statute, which certifications are prerequisites to enrollment in Federal Healthcare Programs and Defendants' receipt of Medicare and Medicaid payments.

463.   The enrollment application that providers must execute to participate in the Medicare program, Form CMS-855A, contains the following certification: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law),** and on the provider's compliance with all applicable conditions of participation in Medicare." (Emphasis added).

464.   After violating the Federal *Stark* and Anti-Kickback Laws, Kalispell Regional violated the Federal False Claims Act through their knowingly false express and implied certifications which were conditions of payment from Federal Healthcare Programs.

465.   For the time period of claims arising from 2011 through the present, Kalispell Regional has submitted thousands of claims to Federal Healthcare Programs which claims represent referrals from employed physicians receiving excessive compensation in violation of Federal *Stark* and

Anti-Kickback Laws.

466.   Kalispell Regional is exclusively in possession of the entire body of evidence exposing their violations of *Stark* and Anti-Kickback laws.

467.   Kalispell Regional is in possession of the UB-O4 forms, Medicare Cost Reports and corresponding Medicaid or TRICARE forms used to make claims for services arising from referrals from employed physicians receiving excessive compensation from Kalispell Regional.

468.   Additionally, Kalispell Regional's certifications of compliance with Federal *Stark* and Anti-Kickback Laws were express conditions of all payments made by federal healthcare programs.

## Count I---Federal False Claims Act 31 U.S.C. Section 3729(a) (1)(A)

469.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

470.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

471.   Kalispell Regional knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

472.   This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

473.   Through the acts described above, Kalispell Regional knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to

be presented, false claims to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

474.   The United States was unaware of the falsity of the records, statements and claims made or caused to be made by Kalispell Regional. In reliance on the accuracy of the claims, information, records, and certifications submitted by Kalispell Regional, the United States paid and continues to pay claims that would not be paid if Kalispell Regional's unlawful conduct was known to the United States.

475.   As a result of the Kalispell Regional's acts, the United States has sustained damages, and continues to sustain damages, in a substantial amount to be determined at trial.

476.   Additionally, the United States is entitled to a civil penalty of between $5,500 and $11,000 for each false claim made or caused to be made by Defendants arising from their unlawful conduct as described herein.

## Count II---False Claims Act 31 U.S.C. 3729(a)(1)(B) Use of False Statements

477.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

478.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

479.   This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

480.   Through the acts described above, Kalispell Regional knowingly made, used, or caused to be made or used, false records and statements, i.e., the false certifications made by Kalispell

Regional in submitting their Cost Reports after each fiscal year to get false claims paid or approved by the United States. Through the acts described above, Kalispell Regional knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B). The records were false in that they purported to show compliance with federal *Stark* and Anti-kickback statutes.

481.   Kalispell Regional knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States.  The statements were made knowingly because the hospital knew, or in the exercise of reasonable care should have known that its payments to employed physicians violated federal Stark and Anti-kickback statutes.

482.   The United States was unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by Kalispell Regional. The United States paid and continues to pay claims that would not be paid if Kalispell Regional's unlawful conduct was known.

483.   By virtue of the false records or false claims made by Kalispell Regional, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial.

484.   Additionally, the United States is entitled to civil penalties between $5,500 and $11,000 for each false claim made and caused to be made by Kalispell Regional arising from their unlawful conduct as described herein.

## Count III---Federal False Claims Act 31 U.S.C. § 3729(a)(1)(C) Conspiring to Submit False Claims

485.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

486.    In pertinent part, the False Claims Act establishes liability for "any person who....conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

487.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

488.    Through the acts described above, Kalispell Regional acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

489.    Kalispell Regional conspired to withhold information regarding excessive compensation to physicians and illegal incentives to physicians who were in a position to refer and/or influence referrals of Medicare, Medicaid, and TRICARE patients and federal employees or retired federal employees to Kalispell Regional.

490.    As a result, the United States was unaware of the false claims submitted and caused by Defendants and the United States paid and continues to pay claims that would not be paid if the Defendants' unlawful conduct was known to the United States.

491.    By reason of Kalispell Regional's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

492.    By virtue of Defendants' conspiracy to defraud the United States, the United States sustained damages and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count IV---Submission of Express and Implied False Certifications in Violation of 31

**U.S.C. § 3729(a)(1)(B)**

493.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

494.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

495.   Compliance with *Stark* and Anti-kickback Laws were explicit conditions of payment under Federal Healthcare Programs. For each of the years between 2011 and the present, Defendants certified compliance with Federal *Stark* and Anti-kickback Laws on their annual cost reports submitted to Federal Healthcare Programs.

496.   Kalispell Regional's certifications of compliance with Federal *Stark* and Anti-kickback Laws were knowingly false.

497.   In reliance on the Kalispell Regional's express and implied certifications, the United States made payments to Defendants under Federal Healthcare Programs. If the United States had known that Defendants' certifications were false, Federal payments under the Federal Healthcare Programs would not have been made to Defendants for each of the years in question.

498.   By virtue of the false records, false statements, and false certifications made by Kalispell Regional, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. §

### 3729(a)(1)(G)

499.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

500.   The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

501.   "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d).

502.   "The OIG may impose a penalty, and where authorized, an assessment against any person...whom it determines...[h]as not refunded on a timely basis....amounts collected as the result of billing an individual, third party payer or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." 42 C.F.R. § 1003.102(b)(9).

503.   Kalispell Regional has knowingly caused and retained overpayments from Federal Healthcare Programs arising from Kalispell Regional's violations of the *Stark* and Anti-Kickback Laws addressed above.

504.   By virtue of Kalispell Regional's causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other Federal Healthcare Programs, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be

determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count VI---False Claims Act 31 U.S.C. 3729 (a)(1)(G) False Record to Avoid an Obligation to Refund

505.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

506.   The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

507.   Kalispell Regional knowingly made and used, or caused to be made or used, false records or false statements, i.e., the false certifications made or caused to be made by Defendants in submitting the cost reports, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

508.   By virtue of the false records or false statements made by the Kalispell Regional, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Prayers for Relief

509.   On behalf of the United States, Relator requests and prays that judgment be entered against Kalispell Regional in the amount of the United States' damages, trebled as required by law, such civil penalties as are required by law, for a qui tam relator's share as specified by 31 U.S.C. §3730(d), and for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730(d), and for all such further legal and equitable relief as may be just and proper.

**JURY TRIAL IS HEREBY DEMANDED.**

Respectfully submitted, this the _20th_ day of September, 2016.

Paul Odegaard, Esq.
Odegaard Brakmann Law, PLLC
1601 Lewis Avenue, Suite 101
Billings, Montana
59102
(406) 640-4441
paul@oblawmt.com

**Lead Counsel**
Bryan A. Vroon, Esq. (*Pro Hac* Admission
Motion to be filed)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com

Edward D. Robertson, Jr. (*Pro Hac* Admission
Motion to be filed)
Bartimus, Frickleton & Robertston
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454
chiprob@earthlink.net

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of the Relator's Complaint Under The

Federal False Claims Act by depositing a true and correct copy of same by Certified Mail in the

United States Mail, postage prepaid, addressed as follows:

The Honorable Attorney General Loretta E. Lynch
Attorney General of the United States
Attention: Seal Clerk
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C.  20530-0001

The Honorable Michael W. Cotter
United States Attorney for the District of Montana
U.S. Attorney's Office
2601 2nd Ave N.
Box 3200
Billings, MT 59101

Megan Dishong, Esq.
Assistant United States Attorney for the District of Montana
P.O. Box 8329
Missoula, MT 59807
(406) 829-3323 phone

This $\underline{2\text{th}}$ day of September, 2016.

Cary L. Knudson

91